Vicente OSORIO, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Lawyers Committee for Human
Rights, Amicus Curiae.

No. 728, Docket 93–4115.

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 1993.

Decided March 7, 1994.

1018

Anne Pilsbury, Brooklyn, NY (Central American Legal Assistance, of counsel), for Petitioner.

Claude M. Millman, Assistant United States Attorney for the Southern District of New York, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, F. James Loprest, Jr., Special Assistant United States Attorney, Diogenes P. Kekatos, Assistant United States Attorney; William Slattery, Immigration & Naturalization Service, Office of District Director; and Janet Reno, Attorney General, Washington, DC, of counsel), for Respondent.

Arthur C. Helton, Lawyers Committee for Human Rights, New York, NY, and John M. DiMatteo, EGLI International, for Amicus Curiae.

Before: NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

OAKES, Senior Circuit Judge:

This petition for review raises several questions under the Immigration and Nationality Act of 1952, *as amended*, (the "Act"), 8 U.S.C. §§ 1101 *et seq.* (1988 & Supp. IV

1992): (1) whether the applicant for asylum was persecuted solely on account of his involvement in an economic dispute with his government and therefore was ineligible for political asylum? (2) whether Congress intended to exclude from eligibility applicants who were persecuted because of their political beliefs and their involvement in an economic dispute with their government? (3) whether the applicant established a well-founded fear of political persecution? (4) whether membership in a union constitutes membership in a social group for purposes of asylum (or withholding of deportation)? and (5) whether it is more likely than not that the applicant's life or freedom would be threatened in Guatemala because of his political opinion?

On March 15, 1989, Vicente Osorio, a Guatemalan union leader, and his wife, Maria Aracely Morales, entered the United States in violation of Act section 241(a)(2). 8 U.S.C. § 1251(a) (1988).[1] They sought asylum or, in the alternative, withholding of deportation. *See* 8 U.S.C. §§ 1158(a), 1253(h)(1) (1988 & Supp. IV 1992). Instead, on August 22, 1990, Immigration Judge John K. Speer (the "IJ") denied Osorio's application for asylum, or withholding of deportation, but granted his application for voluntary departure to Costa Rica. *See* 8 U.S.C. § 1254(e) (1988 & Supp. IV 1992). On April 22, 1993, the Board of Immigration Appeals (the "BIA") affirmed. We now reverse the BIA's denial of Osorio's eligibility for asylum and order that withholding of deportation be granted to Osorio.

## I.

### Asylum and Withholding of Deportation Under the Act

Since 1980, the Act as amended has provided two methods by which a deportable alien, already in the United States, may seek relief: asylum or withholding of deportation. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 1209, 94 L.Ed.2d 434 (1987) (articulating the difference between asylum and withholding of deportation); *see also*

*Sale v. Haitian Ctrs. Council, Inc.,* — U.S. —, —, 113 S.Ct. 2549, 2552–53, 125 L.Ed.2d 128 (1993). Section 208(a) of the Act authorizes the Attorney General, at her discretion, to grant asylum to eligible aliens. 8 U.S.C. § 1158(a). Section 243(h) of the Act requires the Attorney General to withhold the deportation of an alien who demonstrates that if deported his or her "life or freedom would be threatened" on account of one of several enumerated factors. 8 U.S.C. § 1253(h) (setting forth requirements for withholding of deportation).

Asylum and withholding of deportation are " 'closely related and appear to overlap.' " *Carranza–Hernandez v. INS,* 12 F.3d 4, 7 (2d Cir.1993) (quoting *Carvajal–Munoz v. INS,* 743 F.2d 562, 564 (7th Cir.1984)).[2] Nevertheless, there are two important distinctions. First, "[t]he burden of proof that an alien must meet to be *eligible* for asylum is lower than that required of an alien who seeks withholding of deportation." *Carranza–Hernandez,* 12 F.3d at 7 (emphasis added) (citing *Cardoza–Fonseca,* 480 U.S. at 443–50, 107 S.Ct. at 1219–23 (1987); *INS v. Stevic,* 467 U.S. 407, 428–30, 104 S.Ct. 2489, 2500–01, 81 L.Ed.2d 321 (1984); *Saleh v. United States Dep't of Justice,* 962 F.2d 234, 240 (2d Cir.1992); *Gomez v. INS,* 947 F.2d 660, 665 (2d Cir.1991)). Second, once eligibility for asylum has been established, a grant of asylum remains within the Attorney General's discretion. In contrast, "withholding of deportation for those who qualify [is] mandatory rather than discretionary." Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 Fed.Reg. 30674 (July 27, 1990). Thus, although the Attorney General has the discretion to deny asylum to an alien *eligible* under section 208(a), she may not deny withholding of deportation to the same alien if the alien satisfies the stricter standards of section 243(h). *See Cardoza–Fonseca,* 480 U.S. at 443 & n. 28, 107 S.Ct. at 1219 & n. 28 (noting certain statutory exceptions not applicable to this case). For both asylum and withholding of deportation, an

---

**1.** Section 241(a)(2) of the Act is now codified at 8 U.S.C. § 1251(a)(1)(B) (Supp. IV 1992).

**2.** In *Carranza,* this court assumed, without holding, that persecution for union activities entitles

an alien to asylum. *Carranza–Hernandez,* 12 F.3d at n. 1. We now address this question.

otherwise deportable alien bears the burden of establishing eligibility. *See* 8 C.F.R. §§ 208.13, 208.16(b) (1993).

## II.

### *Standard of Review*

#### A. BIA Findings of Fact

■ On petition for review of a BIA judgment, "findings of facts, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." 8 U.S.C. § 1105a(a)(4) (1988); *see Saleh,* 962 F.2d at 238; *Maikovskis v. INS,* 773 F.2d 435, 446 (2d Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). Thus, we must uphold the BIA's or the IJ's factual findings regarding Osorio's *eligibility* for asylum under section 208(a), or withholding of deportation under section 243(h), if they are reasonably supported by substantial evidence on the record. *See Saleh,* 962 F.2d at 238; *Melendez v. United States Dep't of Justice,* 926 F.2d 211, 216–18 (2d Cir.1991). We will reverse BIA findings of fact only if "a reasonable fact-finder would have to conclude" otherwise. *See INS v. Elias–Zacarias,* — U.S. —, —, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (citation omitted).

#### B. BIA Interpretations of Law

■ In reviewing a decision of the BIA, we are mindful of the substantial deference we owe such administrative tribunals in their interpretations of statutory law. Nevertheless, we will reverse an unreasonable interpretation of the BIA. *See INS v. Cardoza–Fonseca,* 480 U.S. at 446–48, 107 S.Ct. at 1221–22 (" '[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent' ") (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)); *Local 144, Hotel, Hosp., Nursing Home & Allied Servs. Union v. NLRB,* 9 F.3d 218, 221 (2d Cir.1993) (citations omitted); Cass R. Sunstein, *Law and Administration After Chevron,* 90 Colum.L.Rev. 2071, 2085 n. 69, 2109 (1990) (cit-

ing cases in which the Supreme Court has rejected agency interpretations of the law since *Chevron* and stating that "agency interpretations will not prevail when they conflict with syntactic norms"); Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State,* 89 Colum.L.Rev. 452, 476–78 (1989) (criticizing the view that courts must defer to an agency's interpretation of the law); Cass R. Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv.L.Rev. 405, 444–46 (1989). Specifically, we will reverse the BIA's interpretation of statutory law where " 'it appears from the statute or its legislative history' " that the interpretation is contrary to Congress's intent. *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (citation omitted); *cf. Cardoza–Fonseca,* 480 U.S. at 453, 107 S.Ct. at 1224 (Scalia, J., concurring) (" 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress' ") (quoting *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781); *compare* Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law* (1989), *reprinted in* 1989 Duke L.J. 511 (giving a broad interpretation of *Chevron* yet stating that one justification of the *Chevron* doctrine is to give deference to an administrative agency's *reasonable* interpretation of the law).

We pause here to note that although the IJ made explicit factual findings, the BIA did not make any specific factual findings; nor did the BIA even reach most of the questions on appeal. Instead it "assumed ... that the factual basis of [Osorio's] persecution claim is worthy of belief." *See In re Osorio,* (Unpublished Decision, No. A29 770 391, New York, April 22, 1993) ("BIA Opinion"). Thus, in effect, the BIA held that, as a matter of law, a Guatemalan union leader, who is persecuted on account of his or her membership in or leadership of a union and the activities that flow therefrom, is not eligible for asylum on any basis. In so holding, the BIA made at least one ill-conceived assumption, which we discuss in greater detail in section V.A.1. of this opinion, and ignored the underlying facts of the dispute in its attempt to characterize this dispute as a pure question of law.

The BIA also failed to reach the question of discretionary exercise of asylum. While the Attorney General has discretion to deny asylum even if the applicant has met the burden of establishing eligibility, this discretion may not be exercised arbitrarily. Therefore, we review, for abuse of discretion, a denial of asylum to applicants who have demonstrated their eligibility for asylum. *See Saleh,* 962 F.2d at 238. If the alien establishes his or her eligibility for asylum, the government must articulate a reason for denying asylum. We now hold that the BIA's interpretation of "political asylum" was incorrect as a matter of law because it contradicts the plain language of the statute, and ignores the interpretation of "political asylum" as set forth by the Supreme Court in *Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 815. We further hold that Osorio has met his burden in demonstrating his eligibility for political asylum and withholding of deportation.

### III.

#### *Background*

A. Circumstances Leading to Osorio's Departure from Guatemala

The petitioner, Vicente Osorio, is a former Guatemalan sanitation worker, who began working for the City of Guatemala in 1971. In 1984, Osorio became a member of the union, Sindicato Central De Trabajadores Municipales (Central Municipal Workers Union) (the "SCTM"). On February 7, 1984, he was elected to the SCTM's Executive Committee for a two-year term. In February 1986, Osorio's co-workers re-elected him to a second term. Of the 6,000 municipal workers in Guatemala City at that time, 3,500 were members of the SCTM. As a member of the SCTM Executive Committee, Osorio was in charge of 500 employees at his work site. Furthermore, as a union leader, Osorio negotiated with the municipal government, and organized demonstrations and strikes—including a strike in April 1986 in which the Guatemalan central government sent police into a municipal building overtaken by the strikers; the police beat and attacked the workers with tear gas.

On November 12, 1986, the SCTM held a general strike of more than 3,000 workers because, as Osorio testified, the "rights of the workers were being trampled upon." The strike lasted only eleven days because, as Osorio testified, union members were being killed. The SCTM Executive Committee went to the Guatemalan Labor Minister for help. Although the Minister declared the strike illegal, he agreed to act as a mediator between the SCTM and the Mayor. In November or December of 1986, the Mayor of Guatemala City selectively fired Osorio and 75 other union members for engaging in the illegal strike.

Several acts of violence against members of the SCTM punctuated the time leading to the November 1986 strike. First, on January 17, 1986, several unidentified armed men shot and killed SCTM member Efraín Cotzal Sisimit in Guatemala City. Then, in February of that year, three heavily-armed men kidnapped SCTM Finance Secretary José Mercedes Sotz Caté, who was beaten before escaping from his abductors. Three months later, Sotz Caté witnessed the shooting of his three-year-old son, an attack undoubtedly meant for Sotz Caté himself, leaving the boy paralyzed from the waist down. *See* Transcript of Hearing at 45, *In re Osorio,* No. 29 770 391 (March 23, 1990) ("Transcript of Hearing"); Guatemala Human Rights Commission/USA, *Guatemala Human Rights Update # 1/92* (January 13, 1992) (citing Amnesty International Report). Then, on July 23, 1986, SCTM Secretary Justo Rufino Reyes was stabbed to death near the municipal building. *See* Transcript of Hearing at 47–48. The IJ characterized these acts of violence surrounding the SCTM as "unfortunate incidents." Incredibly, the BIA makes no reference to these incidents in its decision, although it does discuss in detail the "illegal" November strike.

After the November strike, Osorio unsuccessfully sought reinstatement for the terminated workers. Osorio also testified that he could never again obtain employment in Guatemala City because of his SCTM activities.

Osorio also organized a mass media campaign. During his media appearances, Osorio accused the government of human rights

violations, including charging the government with responsibility for the escalated killings and abductions of union members:

... when we were fired, our next step was to try to get our jobs back and by this we tried to communicate by using the press, the radio and television and I personally spoke out against the injustices against the violation of our rights as workers and indicating [sic] that our free expression, our free thinking was a violation of such rights was against the law.

Transcript of Hearing at 57-58 (March 23, 1990); *see also* Transcript of Hearing at 82 (April 23, 1990).

At this time, violence against the union and its members continued. For example, in 1987, SCTM member Carlos Oscal was kidnapped for three days. Furthermore, despite the election of a civilian government in 1986 to replace the former military dictatorship, violence against organized labor in general continued throughout the period between 1986 and 1989 when Osorio fled Guatemala. *See, e.g., Guatemalan Labor Leader Killed*, Chi.Trib., Sept. 29, 1989, at 4; *U.S. Artists, Writers Protest Killing of Guatemalan Unionist*, Reuters, Aug. 11, 1989 (*available in* LEXIS, News library, Allnws File); Victoria Irwin, *A Voice Against Rights Abuses*, Christian Sci. Monitor, Dec. 13, 1988, at 6 (recounting the story of a well-known union leader who "has been kidnapped by government troops, had a death threat painted on his home, and was told he could no longer teach in his town"); Lindsey Gruson, *Political Violence Up in Guatemala in Recent Months*, N.Y. Times, Nov. 13, 1988, at A1 (quoting Americas Watch observer Anne Manuel as stating that "[i]n spite of two and a half years of civilian government, Guatemala remains one of the worst human rights violators in the hemisphere;" stating that "*politically motivated* kidnappings, disappearances and murders of labor leaders, union organizers and leftists have increased almost every month"; and relating that of the 33 "*politically related* killings in the first 10 months" of the new presidency, "[m]ost of those killed ... were peasants and leftists, including students and *union organizers*") (emphases added); Julio Godoy, *Guatemala: Renewed*

*Violence, Renewed Fears*, Inter Press Serv., May 19, 1988 (*available in* LEXIS, News library, Allnws File) (quoting from a report submitted by Americas Watch to President Cerezo stating that "since Cerezo became president, at least six trade unionists were murdered and another eight have disappeared"); Elizabeth Ross, *Peace Brigadiers Help Central Americans Simply By Their Presence*, Christian Sci. Monitor, Mar. 21, 1988, at 3 (discussing *inter alia* the work of international "watch dog" organizations in safeguarding human rights in Guatemala and El Salvador and in "benefit[ting] striking Guatemalan labor unions, whose members are subject to death threats or kidnapping"); *Guatemala: Bodies of Two "Disappeared" Show Signs of Execution*, Inter Press Serv., Mar. 9, 1987 (*available in* LEXIS, News library, Allnws File) (recounting the gruesome discovery outside Guatemala City of the "bodies of a union leader and a student, their faces mutilated and their heads riddled with bullet holes"); *Guatemala Urged to Probe Alleged Trade Union Killings*, Reuters, (*available in* LEXIS, News library, Allnws File) June 2, 1986 (stating that the I.L.O. "has urged Guatemala's new government to investigate reported killings, woundings and disappearances of more than 70 labor unionists [in] six years").

In December 1988, Osorio received an anonymous note at his home warning him "to abandon the struggle, to stop with the outspokenness, because if I continue with the struggle and my outspokenness, something more serious would happen to me." Transcript of Hearing at 66 (March 23, 1990) (recounting from memory the contents of the written threat).

In January 1989, Angel Melgar, a former rebel, suggested in a publicly-televised interview that certain unidentified Guatemalan unions had been infiltrated by subversive, communist guerrillas. Although Osorio denied that he or his union had been affiliated with the guerrillas, he feared that Melgar's charges left him open to government reprisal. *See, e.g.,* Lucy Hood, *Despite Government Action, Rights Abuses Rise in Guatemala*, Christian Sci. Monitor, Dec. 29, 1987, at 9 ("[i]n its campaign against leftist guerril-

las in the late 1970s and early 1980s, the Army killed thousands of peasants suspected of supporting the guerrillas. *Union leaders, university students, and anyone else considered a leftist sympathizer were also targeted by the Army*") (emphasis added). In February 1989, Osorio received a second note containing a death threat against him and his family. Fearing for their lives, Osorio and his wife fled Guatemala in March 1989.

## B. Osorio's Departure from Guatemala

On March 15, 1989, officials in Texas arrested him and his wife, Maria Aracely Morales de Osorio, also a citizen of Guatemala, upon entering the United States without inspection in violation of the Act. *See* 8 U.S.C. § 1251(a)(2) (1988). The Osorios have left in Guatemala three children, ages 8 to 15, currently cared for by their maternal grandmother. The only family tie of the Osorios in the United States is the aunt of Maria Aracely Morales, who is a legal permanent resident of the United States living in New York.

The Osorios did not apply for a United States visa because Osorio "did not believe that it would be possible for a person in [his] situation to obtain such a visa." Moreover, although exit permission is required to leave Guatemala, Osorio did not obtain such permission because "[he] was afraid to request permission to leave the country." Request for Asylum in the United States, Application of Vicente Osorio (*cited in* Joint Appendix at A–223). Although the Osorios are legally entitled to return to Guatemala, and although the Osorios wish to return to their homeland, Osorio stated that they cannot return to Guatemala at this time because "[he] believe[s] [he] will be killed because of the death threat [he] received.... [He] would return to [his] country if the circumstances changed so that [he was] no longer in danger." *Id.* (*cited in* Joint Appendix at A–224).

## C. The Guatemalan Government's View of Union Activity

 Under the *Elias–Zacarias* test for political asylum, discussed *infra*, to determine whether persecution occurred *on account of* political opinion, we must look to the victim's, not the persecutor's, beliefs. *See*

*Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 816. Nevertheless, the persecutor's view of union activity not only gives the background necessary to understand the dispute leading to the persecution, it also provides some evidence of the victim's political beliefs. *See id.* at ——, 112 S.Ct. at 817 (holding that the victim of persecution must provide direct or circumstantial evidence of the persecutor's motive because the Act makes motive critical). According to the expert testimony of Frank Howard, an attorney with Americas Watch, which is a non-profit organization that monitors human rights abuses in Central America, there are two types of labor unions in Guatemala: independent and government-controlled. SCTM is an independent labor union. The independent labor unions of Guatemala historically have been at the forefront of democratic opposition to the military governments which ruled from 1954 through 1986. During this time, labor organizers and union members have suffered severe political repression as a result of their opposition activities. *See* Americas Watch, *Human Rights in Guatemala During President Cerezo's First Year,* British Parliamentary Human Rights Group, February 1987 (*cited in* Joint Appendix at A–19 to A–64); Transcript of Hearing at 97 to 122 (April 23, 1990). At the hearing, Howard further testified that Melgar's claim that certain Guatemalan unions had been infiltrated by communist guerrillas was probably false. Howard stated that Melgar was under the total control of the army when he made those statements.

After the election of the first civilian government in over thirty years, experts and commentators in the field speculated that the election of a civilian government would reduce, if not eliminate, the violence against union members and other individuals of groups considered by authorities to be subversive or leftist sympathizers. *See, e.g., Revival of Guatemalan Unions,* Latin American Regional Reports: Mexico and Central America, May 2, 1986 ("[r]epressed and silenced by successive military rulers for most of the past three decades, the Guatemalan trade union movement has sprung to life since the mid-January return to civilian gov-

ernment under the christian democrat president Vinicio Cerezo"). This prediction never materialized. "In several respects, the human rights situation has grown appreciably worse following each of two coup attempts in May 1988 and May 1989. In recent months political killings and other attacks have been targeted against prominent labor leaders, human rights activists, student leaders and others who are now or have been involved in political activities." Lawyers Committee for Human Rights, Abandoning the Victims: The U.N. Advisory Services Program in Guatemala 1 (Feb. 1990). Osorio presented substantial evidence that the Guatemalan civilian government also viewed the demands of the independent unions as a challenge to its authority rather than solely an economic matter of bargaining over the terms and conditions of employment. As noted in an exhibit to an amicus brief filed by the Lawyers Committee for Human Rights:

> While the Guatemalan government remains formally a civilian one, and while it can point to new organizational structures for the protection and promotion of human rights, the de facto human rights situation remains extremely grave. Political killings in Guatemala dramatically increased in 1989. *Opposition groups, including non-governmental human rights groups, trade unions and peasant activists have been subject to intimidation, death threats and—increasingly so in recent months— to extra-judicial killings.*

*Id.* at 15 (emphasis added).

D. Immigration Proceedings

On March 23, 1990, the Osorios had a combined deportation and asylum hearing before the IJ. The IJ continued the hearing to April 23 and then again to June 13, 1990 because of the lengthy testimony. At the hearing, Osorio testified about the abuses committed against several union colleagues for their union activities, including the abduction of Sotz Caté, the shooting of his son, and the stabbing death of Reyes. Taken in its entirety, Osorio's testimony establishes a pattern of government abuse against members

of his union consistent with outside accounts of the political abuses against members of Guatemalan unions in general. On August 22, 1990, having taken the case under advisement, the IJ denied asylum and withholding of deportation to both Osorio and his wife.

Mrs. Osorio's case has been administratively closed for readjudication under the "ABC" program. *See American Baptist Churches v. Thornburgh,* 760 F.Supp. 796 (N.D.Cal.1991) (the stipulated settlement of cases alleging that there had been systemic bias in the denial of Salvadoran and Guatemalan asylum claims).[3] Although Osorio himself qualified for ABC readjudication, he waived it because the readjudication would have taken years and the Osorios still had three children in Guatemala. Osorio immediately filed a notice of appeal with the BIA.

Osorio asked the BIA to expedite consideration of his case because the Guatemalan authorities have been known to harm family members of union leaders (such as the son of Sotz Caté), and the Osorios had left their three small children in Guatemala. Despite these repeated requests for expedition, the BIA's decision did not come down until April 22, 1993, over two and one-half years after the decision of the IJ. During the long delay, Amnesty International reported that Guatemalan authorities again threatened the life of Osorio's union colleague, Sotz Caté, forcing him to leave the country. The threatening letter read in part: " 'We are aware of the denunciations you made against the Government while you were abroad, and that you are back in Guatemala working in the trade union movement ... We are giving you a limited time to leave the country or else be physically eliminated.' " *See* Guatemala Human Rights Commission/USA, *Guatemala Human Rights Update # 1/92* (Jan. 13, 1992), Joint Appendix at 10 (quoting from letter).

IV.

*Jurisdiction*

The IJ had jurisdiction to hear Osorio's application for asylum. *See* 8 C.F.R. § 208.-

---

**3.** We must point out that a thorough reading of the IJ's decision reveals some evidence of such bias. Although the facts of this case do not in any way touch upon events in El Salvador, the IJ

writes, "[a] request for asylum is considered an application for both asylum and withholding of deportation to *El Salvador,* pursuant to 8 C.F.R. § 208.3" (emphasis added).

2(b) (1993). The BIA had jurisdiction to hear Osorio's appeal of the IJ's denial of his application for asylum or withholding of deportation. *See* 8 C.F.R. §§ 3.1(b)(1), 236.3 (1993). This court has jurisdiction to hear this petition for review of the BIA's decision. *See* 8 U.S.C. § 1105a(a) (1988 & Supp. IV 1992).

## V.

### *Discussion*

■ An alien who enters the United States without inspection is subject to deportation proceedings. 8 U.S.C. § 1251(a)(2) (1988); *see also Sale,* —— U.S. at ——, 113 S.Ct. at 2552; *Dhine v. Slattery,* 3 F.3d 613, 617 (2d Cir.1993). Under such circumstances, the alien may apply for asylum in the United States or request withholding of deportation to a specific country if the "alien expresses fear of persecution or harm upon return to his country of origin or to a country to which he may be deported after exclusion from the United States." 8 C.F.R. § 236.3(a) (1993).

### A. Request for Asylum

■ The government will grant Osorio's request for asylum if he can prove that (1) he is eligible for asylum, and (2) there are no significant reasons for denying asylum. *See* 8 U.S.C. § 1158(a) (1988); 8 C.F.R. §§ 208.-13, and 208.14 (1993). Osorio is eligible for asylum if he shows that he is a refugee within the meaning of section 101(a)(42)(A) of the Act:

> The term "refugee" means (A) any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A) (1988); *see also Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 815. Moreover, the government may grant asylum to the children or spouse of Osorio if the government grants asylum to Osorio. 8 U.S.C. § 1158(c) (1988).

■ Osorio has the burden of proving that he is a refugee within the meaning of section 101(a)(42). Osorio may establish his refugee status on one of two bases: (1) actual past persecution on account of Osorio's political opinions or his membership in a particular social group, or (2) well-founded fear of future persecution on account of Osorio's political opinions or his membership in a particular social group. *See* 8 C.F.R. § 208.13(b). Our threshold question is whether Osorio's actual past persecution or his fear of persecution is based on grounds declared by Congress to be proper grounds for asylum. Once we determine that Osorio's fear of persecution is based on one of these appropriate grounds, we will examine whether Osorio's fear of persecution was well-founded.

### 1. General Grounds for Eligibility

Congress has set forth five grounds of persecution: (1) race, (2) religion, (3) nationality, (4) membership in a particular social group, and (5) political opinion. As the United Nations' *Handbook on Procedures and Criteria for Determining Refugee Status* (the "U.N. Handbook") notes, "it is immaterial whether the persecution arises from any single one of [these] reasons or from a combination of two or more of them." U.N. Handbook, §§ 66–67.[4] The U.N. Handbook also states that it is not necessary for the applicant to identify the correct ground; the fact finder should consider all or any combination of them. *See id.* Thus, the BIA must have considered all grounds for asylum when it concluded that Osorio "has not demonstrated that his fear of persecution is premised upon political opinion or any of the other enumerated grounds." BIA Opinion, at 4.

The key issue on appeal is whether Osorio's fear of future persecution is on account

4. The U.N. Handbook does not have "the force of law or in any way binds the INS with reference to the asylum provisions.... Nonetheless, the [U.N.] Handbook provides significant guidance in construing the Protocol, to which Congress sought to conform." *Cardoza–Fonseca,* 480 U.S. at 439 n. 22, 107 S.Ct. at 1217 n. 22.

of two specific grounds for asylum: his political opinion or his membership in a social group. Assuming Osorio was persecuted *because of* his membership in or leadership of SCTM, discussed *infra,* we must determine whether such persecution constitutes persecution because of (1) political opinion or (2) membership in a social group. The first question, persecution *because of* political opinion, turns on the answer to the question whether the BIA's characterization of the dispute between Osorio and the City of Guatemala as "economic" precludes a finding that the persecution resulting therefrom may also be properly characterized as political. We take each question in turn.

a. Osorio's Fear of Persecution on Account of His Political Opinion

The BIA dismissed Osorio's plea for asylum in one paragraph:

> [Osorio] has not demonstrated that his fear of persecution is premised upon political opinion or any of the other enumerated grounds. While the Guatemalan authorities [sic] abuse of SCTM members is to be condemned, the fundamental nature of their dispute was economic, concerning wages and the reinstatement of workers. The possible existence of a generalized "political" motive underlying the government's action is inadequate to establish that [Osorio] fears persecution on account of political opinion. *Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 116. General oppression by a government does not demonstrate persecution within the meaning of the Act (citation omitted).

BIA Opinion, at 4.

Distilled to its basic form, the BIA argues as follows: The dispute between Osorio and Guatemala is fundamentally "economic"; therefore, Osorio is ineligible for asylum. To jump from the characterization of a dispute as economic to the conclusion that Osorio is ineligible for asylum, the BIA must have assumed that if a dispute is properly characterized as economic, it cannot be characterized as political.

 The BIA relies on the Supreme Court's decision in *Elias–Zacarias* to make the jump from the characterization of the dispute between Osorio and his government as economic to the conclusion that Osorio is not eligible for asylum. In *Elias–Zacarias,* in construing the phrase, "persecution on account of . . . political opinion," the Supreme Court looked to the ordinary meaning of the phrase and held it to mean "persecution on account of the *victim's* political opinion, not the persecutor's." *Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 816. As an example of his position, Justice Scalia argued that a Jew in a Nazi regime would not have been eligible for *political* asylum (although presumably such a person would be eligible for religious asylum) because Nazis did not persecute Jews on account of their political beliefs, but rather on account of their religious beliefs. Nothing in *Elias–Zacarias* suggests, however, that where an applicant fears persecution for both political and religious beliefs, that refugee should be denied eligibility for political asylum. Similarly, where an applicant fears persecution for both his political and economic beliefs, nothing in *Elias–Zacarias* precludes a finding that the applicant is eligible for political asylum.

Our reading of the BIA's decision, the legal analysis of which is sparse, suggests to us that the BIA's conclusion rests on shaky grounds: According to the BIA, Osorio was *persecuted on account of his economic stands against the government* in the context of economic strife, and, therefore, Osorio was not eligible for asylum because the laws of the United States do not provide for economic asylum.

 The problem is not with the BIA's characterization of the dispute as economic. Rather, the problem is with the BIA's illogical leap from this characterization to the conclusion that Osorio was not eligible for asylum. The plain meaning of the phrase "persecution on account of the victim's political opinion," does not mean persecution *solely* on account of the victim's political opinion. That is, the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution. At oral argument, counsel for Osorio made this point well when she likened the BIA's view to the opinion that Aleksandr

Solzhenitsyn would not have been eligible for political asylum because his dispute with the former Soviet Union is properly characterized as a literary, rather than a political, dispute. Regardless of whether their dispute might have been characterized as a literary dispute, it might also have been properly characterized as a political dispute.

As the U.N. Handbook observed:

The distinction between an economic migrant and a refugee is ... sometimes blurred in the same way as the distinction between economic and political measures in an applicant's country of origin is not always clear. Behind economic measures affecting a person's livelihood there may be racial, religious or political aims or intentions directed against a particular group.

... On the other hand, what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.

U.N. Handbook, at §§ 62–64.

■■■ We agree. Any attempt to unravel economic from political motives is untenable in this case. No substantial evidence supports the view that Osorio's dispute with the Guatemalan governmental officials was solely economic. Rather, substantial evidence, as recounted in the background section of this opinion, compels the view that Guatemalan authorities persecuted Osorio because he and his union posed a political threat to their authority via their organized opposition activities. Although several conflicts between Osorio and his government were in the context of economic disputes, the death threats to him and others were independent of these disputes. Osorio and his union colleagues presented grievances to the government often, but not solely in the form of strikes. And after Osorio's termination, such grievances manifested themselves into an organized media campaign led by Osorio who "became well-known in Guatemala because of the continuous demands that I spoke out. I became very outspoken regarding the de-

mands that I wanted for the union. I spoke out through the ... television, radio, and the newspapers and my demands were very legal.... I was not violating any law when I was expressing these demands through all the means of communication." Transcript of Hearing at 63 (March 23, 1990).

■■■ In applying *Elias–Zacarias* to the facts of Osorio's case, the BIA took as given that the Guatemalan government had actually persecuted Osorio. While acknowledging government persecution of a union leader on account of his union activities, the BIA summarily dismissed the underlying political motives of Osorio's persecutors as irrelevant and argued that Osorio "has not demonstrated that his fear of persecution is premised upon political opinion or any of the other enumerated grounds." BIA Opinion, at 4. In so concluding, the BIA examined neither the political dimension of this dispute nor its political context. The BIA neglected what the Act made critical—political motive. *Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 817. To dismiss the underlying political motives of Osorio's persecutors as "irrelevant," the BIA apparently relied on this passage of *Elias–Zacarias*:

In [the Court of Appeals's] view, a guerrilla organization's attempt to conscript a person into its military forces necessarily constitutes "persecution on account of ... political opinion," ... "because the persecutors' motive in carrying out the kidnapping is political." ... [This is] irrelevant.

*Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 815 (citation omitted). The BIA has misread *Elias–Zacarias*. Under *Elias–Zacarias*, the persecutor's political motive is insufficient to infer the relevant causal connection, persecution on account of the victim's political opinion. As the Supreme Court continues to state, the Act makes motive critical and therefore the victim of the persecution must provide some evidence of the persecutor's motive. *Id.* at ——, 112 S.Ct. at 817.

■■■ Thus, by drawing the conclusion that the dispute between Osorio and Guatemala was economic and not political, the BIA ignored the political context of the dispute. In particular, in a country where the

standard of living is low, and where the government suppresses civil liberties and commits widespread human rights violations, unions (and student organizations) are often the only vehicles for political expression. *See generally* Amnesty International, Guatemala: The Human Rights Record (1987) (recounting stories of government abductions, beatings and executions of trade union leaders on account of their union activities); *see also* C.B. Macpherson, *Problems in Human Rights in the Late Twentieth Century, in* The Rise and Fall of Economic Justice 21, 28 (1985) (arguing that in states such as the "current Latin American regimes" where the standard of living is "so low that a decent human subsistence for everyone cannot presently be provided," the regime often implements a "trade-off" policy in which the regime justifies the sacrifice of human rights as necessary for economic development; such policies, rather than benefitting the poor, have led to "the suppression of trade unions, of political parties, and of elementary civil liberties"). Thus, Guatemalan government persecution of Osorio and other union members on account of their union activities is not political solely because the government views union activities as subversive although such views are some evidence of the persecutor's motives and therefore of the appropriate characterization of the dispute for purposes of asylum. And the persecution is not political solely because of the nature of Osorio's actions, his media campaigning, for instance. Osorio's non-government-controlled union activities, which manifested themselves as opposition to government policies, coupled with his actions after his termination, represented a political threat to the government's authority. As Osorio himself acknowledges: "I continue with my union because I was born with a goal ... to always struggle to achieve things in life, struggle for the good of the workers, struggle for the good of the farmers and the people who are always repressed in our country." Transcript of Hearing at 61 (March 23, 1990). Union leaders such as Osorio also challenge the political status quo in Guatemala by example because they are democratically elected to represent the interests of their constituents. These interests ordinarily include better terms and conditions of employment, or higher wages. These interests also include the attainment of civil liberties, particularly where the employer is the government.

The BIA's decision thus reveals a complete lack of understanding of the political dynamics in Guatemala. Relying on one sentence in *Elias–Zacarias,* "the mere existence of a generalized 'political motive' underlying the [persecution] is inadequate to establish ... the proposition that [the victim] fears persecution *on account of* political opinion," the BIA intentionally ignores the underlying political context of the dispute. *Elias–Zacarias* does not stand for the proposition that we ignore the political motives of the oppressors. Often, such motives are the only evidence of the victim's political beliefs, other than the testimony of the victim himself or herself.

Osorio's union activities imply a political opinion. The Government argues that he has not established what his political opinion is, but the Government's view of what constitutes a political opinion is too narrow. The Government complains that Osorio has never stated "which political party he belongs to, which political philosophy he espouses or which political leaders he supports. He never placed himself, SCTM or the city government at any point along the political spectrum." Government's Brief at 24. We agree with Osorio that the Government's argument betrays an impoverished view of what political opinions are, especially in a country like Guatemala where certain democratic rights have only a tenuous hold. Osorio argues that "it is not only people in political parties who have political opinions." Reply Brief at 10–11. He continues: "[I]n a nascent democracy it is often those outside [ ] the formal institutions of government who are most involved in politics." *Id.* at 11. Osorio is not a politician in the tradition of those who run for office in the twentieth-century United States. Rather, like Aleksandr Solzhenitsyn, Osorio is a dissident, and accordingly marked by the authorities for persecution. Refugee law does not require that Osorio be a politician, only that he is persecuted in his home country for his political beliefs. We believe that Osorio's activi-

ties clearly evince the political opinion that strikes by municipal workers should be legal and that workers should be given more rights. Guatemala's persecution of Osorio was motivated in large part because it wanted to silence the expression of these political beliefs. Consequently, the BIA decision incorrectly stands for the proposition that if a government persecutes a national or resident on account of such person's political beliefs, but the individual is a union organizer whose fame and mode of communication comes through the organization of a labor movement, the individual is not eligible for political asylum because such activity is predominantly economic, not political. *Cf. Sotelo–Aquije v. Slattery,* 17 F.3d 33, 36–37 (2d Cir.1994) (BIA finding that applicant was not eligible for political asylum because although the applicant was an elected leader of CUAVES—an El Salvadoran group that politically opposed a highly organized guerilla organization—and although this guerilla organization sent threats to the applicant and other members of CUAVES, the applicant was persecuted not because of his political beliefs but because he was a community leader; reversed). This interpretation of the Act contradicts the plain meaning of the Act. *See Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 815; Sunstein, *Law and Administration After Chevron, supra* at 2109 (citing cases in which the Supreme Court has implemented syntactical analyses to reject an agency interpretations of the law).

### b. Summary of the Characterization of Osorio's Persecution

In short, we hold that the BIA's interpretation of political asylum contradicts the plain language and congressional intent of the Act. We further hold that Osorio suffered persecution on account of his political beliefs and that the BIA's characterization of Osorio's persecution as solely on account of his economic activities is not reasonably supported by substantial evidence on the record. Therefore, we need not reach the question whether Osorio would also have been eligible for asylum on account of his membership in a particular social group, namely, the SCTM. Instead, having determined that Osorio

feared persecution on account of his political beliefs, we now examine the question whether Osorio was eligible for political asylum.

### 2. Basis for Osorio's Eligibility for Political Asylum

■ Osorio may establish his eligibility for asylum on one of two bases: (1) actual past persecution, or (2) well-founded fear of future persecution on account of his political opinions. *See* 8 C.F.R. § 208.13(b). We find that substantial evidence on the record compels the conclusion that Osorio is eligible for asylum because he has a well-founded fear of persecution on account of his political beliefs.

### a. Eligibility Based on Well–Founded Fear of Future Persecution

To establish a well-founded fear of persecution, Osorio must establish that (1) "he has a fear of persecution in [Guatemala] on account of ... political opinion," (2) "there is a reasonable possibility of actually suffering such persecution if he were to return to [Guatemala]," and (3) "he is unable or unwilling to return to or avail himself of the protection of [Guatemala] because of such fear." 8 C.F.R. § 208.13(b)(2). We have established that Osorio fears persecution because of his political opinion and that he is unwilling to return to Guatemala because of a well-founded fear of prosecution. Therefore, we focus on whether there is a reasonable possibility that Osorio would actually suffer such persecution if he were to return to Guatemala.

To sustain his burden of proving a well-founded fear of persecution, Osorio need not establish that he would be singled out for persecution if he can establish that (A) "there is a pattern or practice in [Guatemala] of persecution of groups of persons similarly situated to the applicant on account of ... membership in a particular social group, or political opinion," and (B) Osorio is a member of and identifies with "such group of persons such that his fear of persecution upon return is reasonable." 8 C.F.R. § 208.13(b)(2)(i)(A), (B). Finally, the "[IJ] shall give *due consideration* to evidence that the [Guatemalan government] persecutes its nationals or residents if they leave the country without au-

thorization or seek asylum in another country." 8 C.F.R. § 208.13(b)(2)(ii) (emphasis added).

### b. Pattern of Persecution in Guatemala

■ As we illustrate above, Osorio's testimony coupled with the background facts of this case establish an overwhelming "pattern . . . in [Guatemala] of persecution of groups of persons similarly situated to [Osorio] on account of . . . [his] political opinion." 8 C.F.R. § 208.13(b)(2)(i)(A). The tragic events preceding the November 1986 general strike themselves compel us to conclude that union leaders like Osorio are at grave risk of persecution by Guatemalan authorities. The IJ incorrectly dismissed these events as "unfortunate incidents," and the BIA, by failing to re-open the hearing to hear evidence that Guatemalan authorities again threatened the life of Osorio's union colleague, Sotz Caté, because of his denunciations of the Guatemalan government while abroad, failed to give *"due consideration* to evidence that the [Guatemalan government] persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country." 8 C.F.R. § 208.13(b)(2)(ii) (emphasis added).

The overall picture reveals a pattern of persecution that is horrific, and rivalled in this hemisphere perhaps only by the pattern of persecution in El Salvador.

### c. Osorio's Identification with Such Group

There is no doubt that Osorio identifies with the group of individuals who are commonly persecuted in Guatemala. It is his identification with this group of individuals, union leaders, that makes his fear of future persecution credible, and well-founded.

In short, we hold that, as a matter of law, Osorio was eligible for political asylum, and that the IJ and the BIA were incorrect in holding otherwise.

### 3. Discretion

■ Although Osorio was eligible for asylum, the Attorney General, in her discretion, may deny asylum to eligible applicants like Osorio. Because of the strength of Osorio's fear of persecution if he were to return to Guatemala, we believe it would be an abuse of discretion not to grant him asylum. Further, none of the mandatory reasons for denial apply in this case. *See* 8 C.F.R. § 208.14.

### B. Request for Withholding of Deportation

■ "If the Asylum Officer denies an alien's application for asylum, he shall also decide whether the alien is entitled to withholding of deportation under section 243(h) of the Act." 8 C.F.R. § 208.16(a). The burden of proof necessary to establish a successful request for withholding of deportation is higher than that necessary to establish a successful request for asylum. *See Cardoza–Fonseca,* 480 U.S. at 446, 107 S.Ct. at 1221 ("Congress did not intend the two standards to be identical"). On this petition for review, the government relies on *Cardoza–Fonseca* for the proposition that "where . . . an applicant cannot meet the requirements for asylum, the applicant *a fortiori* is ineligible for withholding of deportation." Respondent's Brief at 19; *see also Saleh,* 962 F.2d at 240 ("[b]ecause the standard for withholding of deportation is more stringent than that for asylum, and the grounds specified in §§ 1101(a)(42)(A) and 1253(h)(1) are identical, an alien who cannot establish eligibility for asylum cannot obtain withholding of deportation"). However, as we explained earlier, while it is true that an applicant who is not eligible for asylum is *a fortiori* ineligible for withholding of deportation, it is not the case that all applicants denied asylum must be denied withholding of deportation. *See Cardoza–Fonseca,* 480 U.S. at 443–45, 107 S.Ct. at 1219–21. An applicant who proves that he or she is *eligible* for asylum, but is denied asylum in the BIA's exercise of discretion, remains eligible for withholding of deportation. If the applicant is able to meet the higher standard necessary to show eligibility for withholding of deportation, specifically that *"it is more likely than not"* that the applicant's "life or freedom would be threatened in the proposed country of deportation on account of . . . [his or her] political opinion," 8 C.F.R. § 208.16(b)(1), and none of the exceptions apply (none of which apply in this case), then the BIA *must* withhold de-

 

portation. *See Cardoza–Fonseca,* 480 U.S. at 443, 107 S.Ct. at 1219.

■ In this case, Osorio has met his burden. Substantial evidence on the record compels us to conclude that it is more likely than not that his life or freedom would be threatened in Guatemala on account of his political opinion. Many of Osorio's close colleagues have already perished at the hands of the Guatemalan government. In 1986 alone, immediately prior to the November general strike, Osorio's fellow union member, Efraín Cotzal Sisimit, was shot and killed in Guatemala City; his fellow SCTM leader, Sotz Caté, was kidnapped and beaten; Sotz Caté's three-year-old son was shot and paralyzed; and SCTM secretary, Justo Rufino Reyes, was stabbed to death near the municipal building in Guatemala City. Further, all outside accounts of events in Guatemala confirm that union leaders are among those targeted for life-threatening political persecution. Osorio himself was the subject of several death threats. Thus, we hold that the IJ and BIA were incorrect in denying Osorio's application for withholding of deportation.

## VI.

### *Conclusion*

In conclusion, we reverse the order of the BIA. We hold that Osorio is eligible for asylum and order that withholding of deportation be granted to him.