**Olgh UTKOR and Ibeg Utkor, Petitioners,**

**v.**

**Edward McELROY, District Director of the United States Immigration and Naturalization Service, and Paul Schmidt, Director of the Executive office for Immigration Review and Chairman of the Board of Immigration Appeals, Respondents.**

No. 95 Civ. 5127 (SS).

United States District Court, S.D. New York.

April 11, 1996.

U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *New York State Trawlers Ass'n v. Jorling*, 764

F.Supp. 24 (E.D.N.Y.), *aff'd*, 940 F.2d 649 (2d Cir.1991).

Law Offices of Cyrus D. Mehta, New York City (Cyrus D. Mehta, Jacqueline Baronian, of counsel), for Petitioners.

United States Attorney for the Southern District of New York City, F. James Loprest, Special Assistant United States Attorney, for Respondents.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

This action is a petition for a writ of habeas corpus pursuant to 8 U.S.C. § 1105a(a)(10) challenging an order of exclusion by the Board of Immigration Appeals (the "BIA") denying the petitioners' request for asylum and withholding of exclusion under sections 208 and 243(h) of the Immigration and Nationality Act (the "INA" or the "Act"), 8 U.S.C. §§ 1158 and 1253(h).[1] For the reasons set forth below, the petition is **DENIED.**

## BACKGROUND

This petition seeks relief for two brothers, natives of Afghanistan, who left their country in 1989 rather than serve in the Afghan army. From 1981, when Soviet troops intervened in support of a pro-Soviet government, until the victory of the anti-government Mujahedeen in April, 1992, Afghanistan was the last great battleground of the cold war, pitting the United States-supported Mujahedeen against the Soviet army. The petitioners sought to remain neutral.

The following narrative is drawn from the petitioners' testimony at their exclusion hearing before the Immigration Judge (the "IJ"), held on September 17, 1990, which testimony the IJ found "credible and forthright." R. 28. The older brother, Ibeg, was conscripted into the Afghan army in June of 1988, when he was 14 years and six months of age. He paid a bribe in order to be posted to his hometown of Kabul, the capital city, because "[a] war was going on out of Kabul and everyone who went there they were killed by Russian Army and that's why I'd rather stay in Kabul." R. 40–41.[2] In his asylum application he had stated: "I constantly feared being sent to a battle zone.... I did not wish to be in the army and kill my fellow Afghans." R. 68. Ibeg deserted after nine months but was captured and detained for 24 hours. After paying another bribe, he was released and returned to his Kabul posting. In February, 1989, Soviet troops withdrew from Afghanistan. In March or April, Ibeg deserted again and successfully fled to Pakistan with his brother Olgh, where they remained until entering the United States in August, 1989. Ibeg claimed never to have engaged in political activities while in Afghanistan, and that he and his brother had not joined the Mujahedeen when in Pakistan, even though the Mujahedeen had aided his brother and himself once they arrived there.

In his application for asylum, Ibeg stated that if returned to Afghanistan, "I would be

---

**1.** The INA distinguishes between the two forms of relief.

Asylum gives the alien the right to legally remain in the United States, while withholding of return only enables the alien to avoid returning to the country [and only that country] in which the persecution would occur.

*Zhang v. Slattery*, 55 F.3d 732, 737 (2d Cir.1995). In order to obtain asylum, an alien must first prove he or she has a "well-founded fear of persecution" which requires a lower quantum of proof because, even if the fear is established, the grant of asylum is discretionary with the Attorney General. U.S.C. § 1158(a). By contrast,

once an alien shows he "would be threatened," he or she is automatically entitled to the withholding relief. Thus withholding requires the alien to establish the likelihood of persecution by the higher "clear probability" standard, and an applicant who has failed to satisfy the requirements for asylum has necessarily failed to satisfy the requirements for withholding of return. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

**2.** "R" refers to the certified record.

immediately placed in prison for having deserted the army and then fleeing the country." R. 159. At the hearing Ibeg was asked: "What do you think would happen to you if you were sent to Afghanistan now?" He replied: "They will punish me because I left the army and it's ... it will be very big punishment for me and I don't know what they will do. Ma...maybe they will kill me." R. 42. Later in the hearing he asserted the likely result would be, "they will take me back to army. And probably they will punish me because I left Afghanistan and I came to the United States." R. 49.

Olgh is approximately one year younger than Ibeg, and at about the time Ibeg was inducted, was himself taken to an army base and held for 24 hours but released because he was not old enough for induction. Olgh testified that later the army was searching for draft age men in his neighborhood and that he remained in his parents house in order to avoid conscription until he left Afghanistan with his brother. Olgh also stated he had never been involved in political groups. Olgh speculated that if he was deported to Afghanistan, "the first thing I know they will do is they will punish me and they will take me immediately to the war zone." R. 65. In his written asylum application, he was more emphatic: "If I refused to fight against my fellow Afghans, I would be killed." R. 77.

Both petitioners conceded they were excludable under the INA because they had entered the United States without proper documents, but they claimed to be refugees eligible for asylum and withholding of deportation. The IJ denied their request in an oral ruling at the conclusion of the hearing, holding that "[t]hey have failed to establish that the punishment which may be meted out against them would be persecution on account of one of the five grounds within the Act for which protection is afforded." R. 30.[3]

The petitioners timely appealed to the Board of Immigration Appeals (the "BIA") in 1991, citing two grounds: (i) that the withdrawal of Soviet troops had not materially changed conditions in Afghanistan, and thus a 1990 BIA decision reversing an earlier policy of granting limited relief to Afghan aliens escaping conscription should be overruled, and (ii) that petitioners were members of a "social group" comprised of young Afghani males who had refused to take part in the killing of their fellow citizens. R. 12. The appeal was denied by a per curiam order dated October 19, 1993. Between the time of the hearing before the IJ and the BIA decision, the pro-Soviet Afghan government was overthrown by the Mujahedeen.

The BIA based its denial of the petitioners' appeal on two alternative grounds:

(1) "The fact that an alien may be subject to military service in his native country does not demonstrate a well-founded fear of persecution;" R. 3 (citations omitted); and

(2) "[W]e take administrative notice of changed political conditions in Afghanistan since the applicants' hearing. In April 1992, following some 14 years of civil war, the mujahidin guerrilla forces finally deposed the Communist government ... [and] as the applicants' stated claim relates solely to a threat from the Communists, under the present circumstances we do not find that the record now before us supports a determination that they have a well-founded fear of persecution in Afghanistan. While subsequent infighting among the victorious factions has led to periods of civil unrest, these conditions which affect the country's entire population do not establish persecution within the meaning of the Act. Moreover, the applicants' asylum claim in not based upon or related to these conditions." R. 4 (footnote and citation omitted).

The Immigration and Naturalization Service served Olgh Utkor with a notice dated June 14, 1995, requiring him to report for deportation on July 11, 1995. This petition

---

3. The INA's operative language requires "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular

was filed on July 10, 1995.[4]

The habeas petition asserts that the Utkors are entitled to refugee status on two grounds: political opinion and religious affiliation. Pet. Mem at 11 ("The petitioners were not merely unwilling to serve in the Russian backed army, they refused to serve based on their political opinion and religion."). These claims are founded on two exceptions recognized by the BIA and the courts to the doctrine that mere refusal to serve in an army does not entitle a person to refugee status. The exceptions apply to

> those rare cases where a disproportionately severe punishment would result on account of one of the five grounds enumerated in section 1101(a)(42)(A) of the Act, or where the alien would necessarily be required to engage in inhuman conduct as a result of the military service required by his government.

*Matter of A.G.*, 19 I. & N. Dec. 502 (1987); *aff'd, M.A. v. INS*, 899 F.2d 304, 312 (4th Cir.1989) (en banc).

They also challenge, as a due process violation, the administrative notice taken by the BIA of changed conditions in their country, and assert that even under these changed conditions, their past action will subject them to persecution on account of their political opinions. "Petitioners now fear persecution from various Mujahedeen factions who they believe will associate them with the Russian backed forces." Pet.Mem. at 11–12.

■ The parties agree, and I concur, that the standard governing this action requires the petitioners to show that the evidence they presented to the BIA was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992). *See,* Petitioners' Mem. Supporting Issuance of Writ ("Pet.Mem.") at 2; Govt's. Mem. of Law in Opposition to Pet. for Writ ("Govt.Mem") at 20. *See also,* 8 U.S.C. § 1105a(a)(4) (BIA's findings of fact in deportation cases "shall be conclusive" if "supported by reasonable, substantial, and probative evidence.")

As to factual issues, an asylum applicant seeking to overturn the BIA faces a high evidentiary hurdle indeed. "The Supreme Court has cautioned against 'improvidently encroaching[ing] on the authority which the . . . Act confers upon the Attorney General and [her] delegates.'" *Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir.1993). "The BIA's factual findings concerning eligibility for asylum and withholding of deportation must be upheld if supported by substantial evidence." *Sotelo–Aquije v. Slattery*, 17 F.3d 33, 35 (2d Cir.1994) (citing *Sofyan Ali Saleh v. INS*, 962 F.2d 234, 238 (2d Cir.1992)). "Substantial evidence" is a low threshold, well below "preponderance of the evidence." It has been defined as " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ As to matters of law, a court owes "substantial deference" to the BIA, but will reverse an "unreasonable interpretation," or one "contrary to Congress' intent." *Osorio v. INS*, 18 F.3d 1017, 1022 (citing *INS v. Cardoza–Fonseca*, 480 U.S. at 446–48, 107 S.Ct. at 1221–22, and *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984)).

### DISCUSSION

■ This Court's inquiry is restricted to those claims that were reviewed by the BIA, and not additional claims that are raised in this proceeding. *Correa v. Thornburgh*, 901 F.2d 1166, 1170 (2d Cir.1990). The petitioners' claim of religious persecution was raised neither in the hearing before the IJ nor on appeal to the BIA and thus was waived. But even a cursory sifting of the record shows the petitioners have no grounds for a religious persecution claim based solely upon the fact that they are Muslims. From the background materials submitted by the petition-

---

social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

4. Ibeg Utkor was served with a notice of deportation subsequent to the filing of this action.

ers, one learns that less than a tenth of one percent of Afghanistan's population is not Muslim. R. 100–101. There is no evidence in the record that the Muslim religion forbids military service, even in the context of a civil war. Nor is there any evidence regarding the particularities of the petitioners' religious beliefs or why they would be subject to persecution because of them. A generalized religious objection to conscription is insufficient to establish a refugee claim, even under the more generous "well-founded fear" standard governing asylum. *Rodriguez–Rivera v. U.S. Dept. of Immigration and Naturalization,* 848 F.2d 998 (9th Cir.1988) (El Salvadoran alien who claimed Catholic teachings forbade killing denied asylum and withholding of deportation).

■ I now turn to the political persecution claim to determine whether (i) the IJ or the BIA applied an incorrect legal standard and (ii) the evidence adduced by the petitioners at their hearing "compels" a finding that their conduct constitutes a political opinion, and if so, whether they had a well-founded fear of persecution on account of that opinion. *Elias–Zacarias,* 502 U.S. at 481 n. 1, 112 S.Ct. at 815 n. 1.

The Supreme Court in *Elias–Zacarias* considered the asylum claim of a Guatemalan national who had been threatened with conscription by a guerrilla group and refused based on his fear of government retaliation. The claim failed because neither fear of retaliation nor the desire to remain neutral in a civil war, standing alone, equated with a political opinion, and even if they had, the claimant failed to demonstrate that his con-

scriptors' actions were motivated by that opinion. *Id.* at 482, 112 S.Ct. at 816. Although the BIA opinion does not cite *Elias–Zacarias,* it does cite two circuit court cases for the well-established proposition that an alien may not claim asylum merely to escape conscription by his own government. *Rodriguez–Rivera v. INS,* 848 F.2d 998 (9th Cir. 1988); *Kaveh–Haghigy v. U.S. Dept. of Immigration and Naturalization,* 783 F.2d 1321 (9th Cir.1986).[5]

The petition before me relies on the two recognized exceptions to the conscription doctrine, disproportionately severe punishment for refusing conscription and the inhuman conduct of the conscripting army. The disproportionate punishment prong was raised and considered by the IJ, who ruled that the facts before her failed to support such a claim. R. 29. There can be little doubt but that execution would qualify as "disproportionate punishment" for refusing conscription. But in the 77 pages of evidentiary material in the record reporting on human rights violations in Afghanistan at the time the petitioners fled, there is no statement that the Afghan regime was systematically executing, torturing or otherwise persecuting draft evaders or deserters. The petitioners unsupported speculation that they would be executed or otherwise severely punished for refusing conscription is not sufficient to compel a finding by a reviewing court that the IJ erred.[6] In any event the claim was waived because it was not raised in the appeal to the BIA.

The inhuman conduct claim was not explicitly raised on appeal either. The petitioners'

---

**5.** It is surely troubling that this case involves the conscription of a 14 year old and the threatened conscription of a 13 year old. The petitioners, however, have made no claim that such a policy so contravenes established international norms of law so as to rise to the level of "inhuman conduct."

**6.** The cases relied on by petitioners in their briefs are clearly distinguishable from the case at bar. *Rivas–Martinez v. INS,* 997 F.2d 1143 (5th Cir. 1993) distinguished *Elias–Zacarias* on the grounds that an asylum applicant whose would-be guerrilla conscriptors who had caused the death of her husband and threatened her on three occasions, had a well-founded fear of persecution. Nothing approaching such personalized threats, made credible by a killing of a close

relative, are alleged in this case. Petitioners also cite *Canas–Segovia v. INS,* 902 F.2d 717 (9th Cir.1990) for the proposition that "asylum claims by conscientious objectors and by persons who desert when ordered to commit atrocities have been approved." Petitioner's Reply to Govt's. Mem. of Law at 11. In fact, that case did not address inhuman conduct by a conscripting army as a grounds for asylum. But it does offer strong support for the claims of persons who for religious reasons wish to remain neutral in a civil war and fear disproportionate sanctions as a result. The Ninth Circuit opinion, however, was vacated by the Supreme Court, with instructions to reconsider in light of *INS v. Canas–Segovia,* 502 U.S. 1086, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992) (memo. op.).

brief to the BIA merely asserts that "there is a civil war going on in Afghanistan," and "[t]he army of Afghanistan is not a peacetime army" and that the petitioners are thus entitled to asylum because they "do not want to kill their fellow Afghanis." R. 12.[7] Even presuming the issue was properly preserved, the law requires a high level of proof for such a claim. The Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva 1979) asserts that the government sponsoring atrocities must be "condemned by the international community as contrary to basic rules of human conduct." *Handbook,* § 171.[8] Petitioners here rely upon journalistic accounts and reports of human rights organizations in support of their claim. R. 80–154. "A standard of asylum based solely on pronouncements of private organizations or the news media is problematic almost to the point of being nonjusticiable." *M.A.,* 899 F.2d at 313.

I thus conclude that the BIA did not abuse its discretion when it found that the Utkors had failed to show that their refusal to be conscripted occasioned a "well-founded fear of persecution." Because petitioners fail to reach the lower evidentiary standard for asylum, *see* note 1, *supra,* they necessarily fail in their application for withholding of deportation.[9]

### CONCLUSION

For the reasons stated, the petition is denied and the clerk of the court is directed to dismiss the case.

**SO ORDERED.**

---

7. The BIA brief also claims that petitioners' characteristics entitle them to classification as a "social group." Petitioners claim they "are both members of a social class containing young Afghani males who have refused to take part in the killing of their fellow citizens." The law of this circuit is otherwise. "Possession of broadly-based characteristics such as youth and gender will not by itself endow individuals with membership in a particular social group." *Gomez v. INS,* 947 F.2d 660, 664 (2d Cir.1991) (citations omitted). *Osorio* did not alter that standard when it held union organizing had caused the applicant's persecution in that case.

Nor can it be argued that the BIA overstepped its authority by refusing to reinstate a 1982 decision, *Matter of Salim,* 18 I. & N. Dec. 311 which granted a temporary withholding of deportation (but not asylum) to Afghans "who refuse to fight under Soviet command against their compatriots," when the evidence showed "the army resorts to dragooning and forcibly impressing men and boys." In light of the Soviet withdrawal, the BIA changed its policy in 1990. *Matter of Izatula,* 1990 WL 38570 (BIA 1990). "Numerous Supreme Court decisions recognize the intimate connection between immigration decisions and foreign policy, and based on separation of powers principles, reject a significant role for the courts in these matters." *M.A. v. INS,* 899 F.2d 304, 313 (4th Cir.1989) (citing cases).

8. The Supreme Court has held that the *Handbook* "provides significant guidance" in determining refugee status. *Cardoza–Fonseca,* 480 U.S. at 439 n. 21, 107 S.Ct. at 1217 n. 21.

9. Because I find that the BIA properly reached its decision on the grounds that "the applicants have not met the well-founded fear standards of eligibility," R. 3, I do not reach the issue of whether it properly took administrative notice of the overthrow of the pro-Soviet Afghan regime. The circuits are in agreement that an asylum applicant has a due process right to challenge the BIA's noticing of facts. There is disagreement as to whether a motion addressed to the BIA to reopen is the proper procedure or whether an applicant may appeal directly to the federal courts. *Compare, Gomez–Vigil v. INS,* 990 F.2d 1111, 1124 (9th Cir.1993) ("Where a claim requires a factual showing, one which may depend on live testimony or oral argument, our courts have found 'the abbreviated procedure in a motion to reopen before the BIA is simply not a substitute.' "); *Llana–Castellon v. INS,* 16 F.3d 1093, 1100 (10th Cir.1994) (adopting *Gomez–Vigil* ) with *Gebremichael v. INS,* 10 F.3d 28, 38 (1st Cir.1993) ("We agree with the majority of those circuits which have addressed the question that the motion to reopen process can ordinarily satisfy the demands of due process."); *Kaczmarczyk v. INS,* 933 F.2d 588, 597 (7th Cir.1991) (same); *Gutierrez–Rogue v. INS,* 954 F.2d 769, 773 (D.C.Cir.1992) (same); *Rivera–Cruz v. INS,* 948 F.2d 962, 967 (5th Cir.1991) (same).