See also, 29 Fed.Cl. 606.

Dr. Ben BRANCH, Trustee of Bank of New England Corp., derivatively on Behalf and in the name of MAINE NATIONAL BANK, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–133C.

United States Court of Federal Claims.

July 20, 1994.

England Corp. ("BNEC"). Plaintiff brings this claim derivatively on behalf and in the name of Maine National Bank ("MNB"), a wholly-owned subsidiary of BNEC.

MNB was a national banking association established in 1889. In 1985 MNB was acquired by BNEC, a bank holding company that owned a number of other subsidiary banks, including Bank of New England, N.A. ("BNE"), and Connecticut Bank and Trust Co., N.A. ("CBT"). In the late 1980's, MNB and CBT maintained healthy account balances and were considered to be in good financial health.

On August 9, 1989, FIRREA became effective. FIRREA was enacted in response to the growing concern over the well-being of the nation's financial institutions and the continued viability of the Federal Deposit Insurance Fund. FIRREA gave the federal government broad powers to address this concern. Among these powers was the cross-guarantee assessment power, which provides:

> Any insured depository institution shall be liable for any loss incurred by the [Federal Deposit Insurance] Corporation, or any loss which the [Federal Deposit Insurance] Corporation reasonably anticipates incurring, after August 9, 1989 in connection with—
>
> (i) the default of a commonly controlled insured depository institution; or
>
> (ii) any assistance provided by the [Federal Deposit Insurance] Corporation to any commonly controlled insured depository institution in danger of default.

12 U.S.C. § 1815(e)(1)(A) (Supp. IV 1992) (the "cross-guarantee statute"). A company is deemed to "control" a bank if

> (A) the company directly or indirectly ... owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company;
>
> (B) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or
>
> (C) the Board determines, after notice and opportunity for hearing, that the company directly or indirectly exercises a control-

William F. Sheehan, Washington, DC, for plaintiff; Celestine R. McConville, Shea & Gardner, of counsel.

Joan M. Bernott, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant; Thomas A. Schulz and Wendy B. Kloner, F.D.I.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This case, before the court after argument on cross-motions for summary judgment, raises the issue of whether application of the cross-guarantee assessment provisions of the Financial Institutions Reform, Recovery and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in scattered sections of 12 U.S.C.) ("FIRREA"), constitutes a taking without just compensation in violation of the Takings Clause of the Fifth Amendment of the United States Constitution.

## FACTS

The following facts are undisputed. Dr. Ben Branch ("plaintiff") is the Chapter 7 Trustee of the Estate of the Bank of New

ling influence over the management or policies of the bank or company.

12 U.S.C. § 1841(a)(2).

Beginning in 1986, BNE encountered financial difficulties caused by management problems and a risky loan portfolio.[1] Despite BNE's grave problems, the bank was allowed to stay open while attempts were made to stabilize the bank by transferring substantial assets to it from BNE's parent company, BNEC. These efforts were unsuccessful. On January 3, 1991, BNEC's management met with the Office of the Comptroller of the Currency (the "OCC") in Washington, DC, and advised the officials that BNE's capital accounts were exhausted.

On January 6, 1991, the OCC declared BNEC and BNE insolvent and appointed the Federal Deposit Insurance Corporation (the "FDIC") as their receiver. On the same date, the FDIC served MNB with a Notice of Assessment of Liability for $1,015,900,000.00 pursuant to the cross-guarantee statute.[2] This amount represented the FDIC's estimate of loss anticipated as a result of BNE's failure. On January 6, 1991, MNB had a net worth of approximately $65 million. MNB informed the FDIC that it was unable to pay the amount of the assessment. Treating the assessment as a valid debt of MNB's, the OCC declared MNB insolvent, closed the bank, and appointed the FDIC as receiver. Similar action was taken with regard to BNE and CBT. On January 7, 1991, BNEC filed for bankruptcy.

Upon MNB's, BNE's, and CBT's closure, the FDIC was named receiver for each of the banks and took possession of all of the assets of those banks. The FDIC then transferred most of those banks' respective assets and liabilities to three "bridge banks" created by the FDIC to continue operation of the insolvent banks until they could be sold. The bridge banks (New MNB, New BNE, and New CBT) were owned and operated by the FDIC until the Fleet/Norstar Financial Group, Inc. ("Fleet Bank"), was declared the successful bidder for the closed BNEC banks. Most of the assets and liabilities of the bridge banks were then transferred to Fleet Bank. Some assets, though, remained in the bridge bank receiverships, just as some assets had remained in the BNE, CBT, and MNB receiverships.

Plaintiff filed suit in the Court of Federal Claims on March 5, 1993, seeking recovery of an amount not less than $65 million. Plaintiff alleges that when the FDIC forced the failure of MNB and seizure of the bank's assets, the FDIC took MNB's property for a public purpose without just compensation. Since the value of MNB's assets exceeded its liabilities by at least $65 million at the time of the seizure, plaintiff would hold the Government liable for at least that amount.

## DISCUSSION

### 1. *Summary judgment standard*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

1. The parties agree, however, that no allegation was made that BNE's collapse was caused by fraud, misconduct, or disregard of the separate corporate forms of the BNEC subsidiaries. There has been no allegation that BNE was used as a shelter for bad loans, as was the fear prior to the passage of FIRREA. Indeed, defendant asserted at oral argument that under FIRREA such factors are irrelevant for purposes of the cross-guarantee provision. Transcript of Proceedings, *Ben Branch v. United States,* No. 93–133C, at 42 (Fed.Cl. June 17, 1994) (hereinafter "Tr.").

2. On December 22, 1992, the FDIC revised this amount to $98,985,000.00.

**630**

■ In the capacity of opposing each other's motions, the parties must provide sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553. When reviewing a motion for summary judgment in a case asserting an unconstitutional taking, a court should avoid "precipitous grants of summary judgment" due to the "fact-intensive" nature of such claims. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983); *see also Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1559–60 (Fed. Cir.1985); *Skaw v. United States,* 740 F.2d 932, 939 (Fed.Cir.1984). A trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

**2.** *Standard for finding an unconstitutional taking*

■ A regulation may result in a taking if it 1) effects a physical invasion or permanent occupation of a claimant's property, or 2) interferes with a claimant's property rights. *Golden Pacific Bancorp v. United States,* 15 F.3d 1066 (Fed.Cir.1994). When a regulation does not amount to a permanent physical occupation, but nonetheless interferes with property rights, a case-by-case approach is used to determine whether government action constitutes a taking. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). Factors to be considered are " 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.' " *Id.* (quoting *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980)).

■ In the case of a physical invasion, the injury is compensable "without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Council,* 505 U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)); *see Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982)

("[W]hen the 'character of the governmental action' ... is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." (citation omitted)). The court still must look to the economic impact of the government action, as well as the claimant's expectations. The expectation analysis remains important because, "while the challenged government action [may have] caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

Defendant moved for summary judgment on the basis that plaintiff claims a regulatory taking, which must be evaluated under the three factors enunciated in *Monsanto.* Applying these factors, defendant contends that plaintiff's claim fails as a matter of law. According to defendant, the Federal Circuit's recent decision in *Golden Pacific* instructs that MNB operated in a highly regulated industry and "voluntarily participated in and reaped the benefits of" the deposit insurance system that allowed the seizure of its assets. Def's Br. filed Feb. 15, 1994, at 12. Because MNB knew of the regulation and voluntarily submitted itself to the conditions required of all FDIC-insured institutions, MNB lacked the requisite investment-backed expectations for a takings claim. Defendant also emphasizes that the public character of the assessment militates against finding a taking. The assessment was used to strengthen the nation's banking system and thus promoted the public good. Finally, defendant argues that the assessment and its impact on MNB cannot be viewed in isolation; rather, both must be viewed in the overall scheme in which they occurred. The overall provisions of FIRREA benefitted BNEC. Even if the assessment imposed a heavier burden on MNB, the harm to MNB was only part of the impact that FIRREA had on BNEC. When the impact is viewed in the context of its impact on BNEC's assets as a whole, BNEC

was deprived only a "strand" from its "bundle" of property rights. Def's Br. filed Feb. 15, 1994, at 32.

It is plaintiff's position that defendant's seizure of MNB's assets was a per se taking that was not merely part of an overarching regulatory scheme. The assessment and subsequent seizure constituted a physical appropriation of all of MNB's assets that extinguished MNB's property rights and transferred actual possession and control of the assets to defendant. Plaintiff maintains that compensation therefore is owed for this seizure.

Alternatively, plaintiff argues that the assessment qualifies as a regulatory taking under the *Monsanto* criteria. Plaintiff takes issue with defendant's assertion that, since the assessment promoted a public good, no taking occurred. The fact that the Government appropriated all of MNB's property for its own use indicates that the assessment was not carried out to prevent harm to the public. Nor was the seizure of its assets beneficial to MNB, as was the case with plaintiffs in *Golden Pacific*. In *Golden Pacific* the OCC declared plaintiff bank insolvent and seized the assets to satisfy the bank's debts. In contrast, MNB was solvent at the time of the assessment and received no benefit from being seized. Plaintiff argues that the enactment of the assessment power under FIRREA was a radical departure from the historic banking policy of insulating banks from the failure of other banks that was not reasonably foreseeable. Because the enactment of FIRREA changed the regulatory foundation upon which plaintiff's participation in the banking industry was based, the assessment interfered with plaintiff's reasonable investment-backed expectations. Finally, plaintiff asserts that the common ownership of BNEC did not effect a waiver of its rights. Under the Bank Holding Company Act, 12 U.S.C. §§ 1841–1850 (1988), and well-established legal precedent, the separate corporate status of corporations must be respected. MNB's assumption that its separate status would be respected for the period preceding FIRREA was reasonable. MNB's continuation in the banking industry after FIRREA entered into force did not change this. Plaintiff explains that it had no choice but to retain FDIC insurance under the post-FIRREA conditions if it wished to retain its banking charter.

### 3. *Nature of the MNB assessment*

When an insured depository institution in a multi-bank system "is in default or requires assistance to prevent default," 12 U.S.C. § 1815(e)(2)(A), FIRREA requires the FDIC to make a good-faith estimation of the expected loss from a default and advise each commonly controlled depository institution of this amount. The statute requires no finding of wrongdoing, mismanagement, or any disregard for the corporate form as a predicate for assessment. Upon presentment of a written demand for this amount and after consultation with the appropriate state and federal agencies, the FDIC may demand immediate payment of the loss from any other bank sharing common control. 12 U.S.C. § 1815(e)(2)(B).

Prior to January 5, 1991, MNB was a viable bank with a profitable business. Its assets exceeded its liabilities by roughly $65 million. On January 6, 1991, MNB no longer existed. This stark contrast was the result of the FDIC's application of FIRREA. The OCC seized its assets and transferred them to entities owned and operated by the Government as a result of the FDIC's section 1815(e) assessment. These same assets were later sold off with the profits retained by the Government. Neither party disputes that the seizure occurred or that MNB thereby was deprived of its assets. The parties diverge totally, however, on the legal effect of the Government's actions.

Under *Loretto* the total physical appropriation of MNB's assets would appear to be an act that requires a finding that a taking occurred. If the Government physically occupies private property, a compensable taking results. *United States v. Pewee Coal Co.,* 341 U.S. 114, 116, 71 S.Ct. 670, 671, 95 L.Ed. 809 (1951). No inquiry need be made into whether the action is for the public good or has only a minimal impact on the owner. *Hendler v. United States,* 952 F.2d 1364, 1375 (Fed.Cir.1991). Prior to the enactment of FIRREA, MNB had a right to exclude the FDIC from its property, even if its parent

company became insolvent.[3] FIRREA revoked this right in a manner that violated MNB's reasonable investment-backed expectations. It extinguished this right to exclude in a manner that is inconsistent with the Fifth Amendment.

In either per se or regulatory takings analysis, it is important to determine plaintiff's reasonable investment-backed expectations. The Federal Circuit recently described the rationale for this analysis as

> a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory scheme.
>
> . . . .
>
> In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss . . . .

*Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994). Since plaintiff operated in a highly regulated industry, and the alleged taking occurred pursuant to a regulatory scheme, this regulatory framework provides an objective benchmark for assessing plaintiff's expectations.

*4. Plaintiff's historically-rooted expectations*

■ In *Preseault v. United States,* 27 Fed. Cl. 69 (1992), *appeal docketed,* No. 93–5067 (Fed.Cir., Jan. 28, 1993), this court analyzed the effect that pervasive regulation had on a landowner's investment-backed expectations. The landowners in *Preseault* purchased land subject to a railroad easement that could only revert if the Interstate Commerce Commission issued a certificate of abandonment for the rail line. At the time they acquired their reversionary interest, federal and state law made clear that the Government would take all feasible steps to assure availability of the easement for future rail use. This court held that since plaintiffs had acquired their

reversionary interest in land against a backdrop of pervasive federal and state regulation that made their expectation of eventually obtaining the fee essentially non-existent, they could not claim a compensable taking. *Id.* at 94.

■ *Preseault* recognizes the proposition that if property is acquired that is subject to a heavily regulated statutory scheme, a claimant's investment-backed interests must be viewed in light of this regulation. *Accord United Nuclear Corp. v. United States,* 912 F.2d 1432, 1437 (Fed.Cir.1990). In *Preseault* the property in question was purchased well after the congressional enactments were in place that severely constricted the landowners' interest in the property. MNB's interests, in contrast, were nearly 100 years old when FIRREA came into being. The crucial inquiry is to identify a claimant's expectations when the subject property was acquired, not when the regulation affecting them came into force. Moreover, FIRREA was not a logical extension of prior regulation. Given these circumstances, FIRREA changed MNB's reasonable investment-backed expectations.

*Golden Pacific* and the case on which it was based, *California Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed. Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992), employed the same type of analysis. In *California Housing Securities,* the court looked to a savings and loan institution's historically-rooted expectation that it could exclude the Government from its premises. The court analyzed the state of the law at the time plaintiff entered the banking market, as well as the changes made to this law by FIRREA. The court concluded that in deciding to enter the banking market

> "Saratoga understood, with what may only be viewed as a historically rooted expectation, that the federal government would

---

**3.** Defendant cites *Senior Unsecured Creditors' Committee v. F.D.I.C.,* 749 F.Supp. 758 (N.D.Tex. 1990), in support of its assertion that the FDIC had the power to hold banks responsible for other banks' debts. That case, however, involved the FDIC's use of a contract under which affiliated banks guaranteed an FDIC loan to the lead bank in the system. The court upheld the FDIC's authority to use such a contract. It did not recognize the FDIC's general authority to hold other banks liable outside of an express guarantee contract. No such contract existed between MNB and the FDIC.

take possession of its premises and holdings as conservator or receiver if it substantially dissipated its 'assets or earnings due to any violation or violations of law or regulations, or to any unsafe or unsound practice or practices[.].' "

*Id.* at 958 (citation omitted). FIRREA had not changed the savings and loan institution's expectation in this regard. *Id.* at 959 (FIRREA changed law governing conservatorship and receivership "more procedurally than substantively."). Similarly, the court held in *Golden Pacific* that a bank's expectations "could only have been that the FDIC would exert control over the Bank's assets if the Comptroller became satisfied that the Bank was insolvent and chose to place it in receivership." 15 F.3d at 1074. In both cases no showing was made that FIRREA changed the claimants' expectations in a significant, unanticipated manner.[4] This is not the case with MNB.

 It is also undisputed that the assessment and seizure extinguished MNB's property rights. Plaintiff had a reasonable expectation that, if it complied with the applicable banking regulations, plaintiff would remain in possession of its assets, would not be held accountable for debts that were not its own, and would not be seized by the Government. The case at bar is noticeably distinguishable from both *Golden Pacific* and *California Housing Securities* in that FIRREA caused MNB to be held liable for debts that were not its own. This was an unforeseeable and radical departure from the system under which MNB had been operating for almost a century. Corporations are treated as separate legal entities and are not responsible for the debts of other corporations, even though they share common shareholders or officers. *International City Bank & Trust Co. v. Morgan Walton Properties, Inc.,* 675 F.2d 666, 669 (5th Cir.) *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 511 (1982); *Crown Cent. Petroleum Corp. v. Cosmopolitan Shipping Co.,* 602 F.2d 474, 477 (2d Cir.1979). Absent some showing of fraud or disregard of the corporate form, the corporate veil may not be pierced. *Tennessee Valley Auth. v. Exxon Nuclear Co.,* 753 F.2d 493, 497 (6th Cir.1985); *American Bell Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 887 (3rd Cir. 1984). BNE, like plaintiff in *Golden Pacific,* brought about the conditions that caused the seizure of its assets. At present, the record would not support a finding that MNB did anything to cause its failure, other than share common ownership with BNEC.[5] Under MNB's reasonable historic expectations, this relationship would not suffice to cause it to be held responsible for BNE's liabilities.[6]

4. None of the cases cited by defendant in support of its argument involved an instance where FIRREA changed significantly the expectations of the claimant; nor did any cases cited involve the cross-guarantee provision. *See North Arkansas Medical Center v. Barrett,* 962 F.2d 780 (8th Cir. 1992) (holding that FIRREA provision that denied plaintiff priority claim against FDIC as receiver of failed thrift was not a taking because plaintiff had notice of Government regulation over failed thrifts); *McAndrews v. New Bank of New England, N.A.,* 796 F.Supp. 613 (D.Mass. 1992), *aff'd,* 989 F.2d 13 (1st Cir.1993) (holding that FIRREA provision that prevented landlord from terminating lease with insolvent bank was not a taking); *LB Credit Corp. v. Resolution Trust Corp.,* 796 F.Supp. 358 (N.D.Ill.1992) (holding that FIRREA's limitation of damages that can be sought from insolvent bank for breach of contract was not a taking); *F.D.I.C. v. Cobblestone Corp.,* 1992 WL 333961 (D.Mass.1992) (same); *American Continental Corp. v. United States,* 22 Cl.Ct. 692 (1991) (holding that plaintiff had no reasonable expectation that bank would not be seized if it allowed itself to become insolvent). The court's decision today is based on the fact that, unlike the preceding cases, section 1815(e)

swept away over a century of law that had achieved almost hornbook status as it applied to plaintiff.

5. During oral argument, after the court had indicated a disposition for holding a trial in order to develop more fully the record concerning the dealings between the banks and BNEC's control over BNE's and MNB's banking affairs, defendant was insistent that this type of information was irrelevant, as FIRREA mandates a forfeiture regardless of the bona fides of a bank's dealings. Tr. at 42.

6. Defendant submitted a magistrate's recommended ruling in *Meriden Trust & Safe Deposit Co. v. F.D.I.C.,* No. 2:92CV967 (D.Conn. Apr. 26, 1994) (adopted by district court on July 7, 1994). In *Meriden* the court held that the FDIC's assessment of a sister bank under the cross-guarantee provision of FIRREA was not a taking. Several factors diminish the persuasiveness of this holding. District courts have jurisdiction concurrent with the Court of Federal Claims for "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded ...

■ Although plaintiff chose to do business in a heavily regulated industry, the act of subjecting itself to this regulation cannot be deemed a total forfeiture of all property interests. While some property rights may be waived—and the attendant investment-backed expectations diminished—as a result of extensive regulation, conducting business in a heavily regulated industry does not give the Government power to do whatever it wants. *Loretto*, 458 U.S. at 439, 102 S.Ct. at 3178 ("[T]he government does not have unlimited power to redefine property rights...."). Even in a heavily regulated industry, a claimant's waiver of rights is limited to what conceivably could be seen as waived at the time. It is not a total forfeiture of every interest.[7] *See United Nuclear Corp.*, 912 F.2d at 1436 (holding that mining company's agreement that leases would be subject to future regulation could not have foreseen change in regulation allowing for proscriptive approval of leases by Indian tribe). The focus of the analysis is what the property owner's reasonable, real-world expectations are when the property was acquired.

Defendant's argument is unconvincing that MNB lost any expectation that it may have had when it voluntarily continued receiving FDIC insurance after the enactment of FIRREA. Had MNB wished to discontinue FDIC insurance, it would have been forced to give up its federal bank charter. 12 U.S.C. §§ 222, 501a (1988). In addition, it could not have acquired a state charter if it gave up its federal charter, since the State of Maine requires FDIC insurance for its chartered banks. Me.Rev.Stat.Ann. tit. 9–B, § 422(1) (West 1964). Since FDIC insurance was a prerequisite for either a state or a federal charter, MNB's only choices were continuing its coverage or going out of business. When faced with this choice, it could hardly be said that MNB voluntarily acquiesced to the cross-guarantee statute.

Defendant's attempt to characterize the cross-guarantee assessment power as a new condition of Federal Deposit Insurance agreed to by banks that retained the coverage also fails. Because MNB had no choice but to retain the insurance, this was an attempt by the Government to override the Fifth Amendment by legislative fiat. This the Government may not do. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation....").

■ Finally, defendant's assertion that the relevant plaintiff in this suit is BNEC, not MNB, and that the seizure of MNB resulted in the destruction of only a "strand"

upon the Constitution...." 28 U.S.C. § 1346(a)(2). If the bank's claim in *Meriden* was a taking claim, it would appear that the district court lacked jurisdiction to decide this issue. The bank could not have sought to overturn the FDIC's action through the use of the Takings Clause, since the Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987) (emphasis in original). Moreover, the ruling's takings analysis is based exclusively on a single passage from *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 106 (1986). It does not explore the claimant's reasonable historically-rooted expectations and does not engage in either a per se or a regulatory takings analysis. Instead, the court reasoned that since Meriden "voluntarily chose to maintain FDIC insurance.... [its] claim that it could not reasonably expect to be subject to statutory cross-guarantee liability rings hollow."

Slip op. at 8. In addition, several aspects of the seized bank distinguish it from MNB. Although insured by the FDIC, Meriden held the deposits of only two depositors at the time of its seizure: one from its parent corporation and one from its seized sister bank. It did not accept deposits from the public at the time it was seized. The differences between plaintiff banks, as well as the minimal analysis of the ruling, do not justify reliance on this ruling.

7. As the D.C.Circuit recently noted:

Although the Supreme Court has suggested that doing business in a regulated field might reduce an enterprise's reasonable expectation of noninterference, ... we are unsure how much weight to put upon governmental supervision and regulation in takings analysis. In this era of pervasive regulation, this factor might prove far too much: almost any entity could be said to have a reasonable expectation of governmental intrusion.

*Colorado Springs Prod. Credit Ass'n v. Farm Credit Admin.*, 967 F.2d 648, 655 n. 8 (D.C.Cir.1992).

in BNEC's "bundle of rights" is based on a misapprehension of the law.[8] Individual pieces of property are not the "strands" to which Justice Brennan was referring in his oft-quoted metaphor. Rather, the "strands" are the incidents of ownership, such as the right to exclude, or, in that case, the right to sell property commercially. *Andrus v. Allard,* 444 U.S. 51, 64–65, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979). The fact that BNEC owned other property is irrelevant to whether compensation must be paid for the total appropriation of one of BNEC's many possessions. While BNEC is the nominal plaintiff, the real party in interest, for which BNEC sues derivatively, is MNB. Although defendant asserted during argument that "[w]hat was lost here was the value of the shares of MNB that were owned by a holding company that controlled BNE, which failed...." Transcript of Proceedings, *Ben Branch v. United States,* No. 93–133C, at 14 (Fed.Cl. June 17, 1994) (hereinafter "Tr."), the actual property seized was the assets of MNB. Since MNB no longer exists, suit has been brought on its behalf by the trustee of its parent and sole shareholder, BNEC.

### 5. *Regulatory takings analysis*

It is undisputed that MNB's assets were seized for a public purpose, namely to recoup the cost of satisfying BNEC's debts. Nevertheless, the presence of the public good that defendant urges is promoted by application of the cross-guarantee statute hardly can be used to circumvent the express command of the Fifth Amendment. While it is true, as the Supreme Court cautioned in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986), that "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another," it is not true that the Takings Clause is never violated so long as legislation is for the public

good. Defendant asks this court to extend the Supreme Court's language in *Connolly* beyond its intended bounds. Takings do occur even when the taking is done for the benefit of the public. *See Lucas,* 505 U.S. at ——, 112 S.Ct. at 2894 (explaining that the rationale behind denying compensation when "the legislature is simply 'adjusting the benefits and burdens of economic life'...." does not apply in cases when a property owner is deprived of all economically beneficial use of his property) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659). In fact, it is assumed in takings analysis that the property is being taken for the public's benefit. As the Supreme Court explained, "[t]he purpose of forbidding uncompensated takings of private property for public use is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). The assessment and seizure of MNB is such a case.[9]

In *California Housing Securities,* the Federal Circuit applied a *Loretto* per se analysis in determining whether the seizure of plaintiff bank by the OCC constituted a taking. The court did not conclude that a taking had occurred because plaintiff lacked "the historically rooted expectations of ownership that underlie *Loretto*...." 959 F.2d at 959–60. Similarly, in *Golden Pacific,* the Federal Circuit noted in dictum that the OCC's seizure of plaintiff bank was "in a very real sense, a physical invasion and permanent occupation as a far as the premises of the Bank were concerned...." 15 F.3d at 1073. The court declined to decide whether the action was a per se or regulatory taking, however, since plaintiff's expectations barred recovery under either analysis. In the case at bar, plaintiff's expectations do not bar recovery. The fact that all of plaintiff's assets have been seized

---

8. During argument defendant focused on the impact of the assessment on BNEC "whose sole suffering here [was] the losses of all the value of [its] shares in MNB." Tr. at 58.

9. Nor is this action removed from takings analysis because it was accomplished pursuant to the police power. Preserving the Federal Deposit

Insurance Fund cannot be characterized as government action undertaken "for the restraint and punishment of crime, for the preservation of the public peace, health and morals" that falls under the police power. *Mugler v. Kansas,* 123 U.S. 623, 658, 8 S.Ct. 273, 295, 31 L.Ed. 205 (1887).

precludes the use of a regulatory analysis. Defendant's argument that "justice and fairness" justify the effect of the cross-guarantee provision is inappropriate in a per se analysis.[10]

The nature of the Government's action is to safeguard the Federal Deposit Insurance Fund. This is a public purpose unrelated to the police power. To the extent that defendant is arguing that the court should balance the Government's interest in protecting the integrity of the nation's banking system against MNB's property interest, this analysis is inapplicable under a per se analysis. In addition, it is without question that the seizure of MNB's assets resulted in a significant economic harm to MNB.

Defendant asserts that *Connolly* and *Concrete Pipe & Products v. Construction Laborers Pension Trust*, —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), command a finding that no taking occurred as a result of the assessment against MNB, but these cases are distinguishable. Plaintiff in *Connolly* claimed that Congress's amendment of the Employee Retirement and Income Security Act, 29 U.S.C. §§ 1001–1461 (1976) ("ERISA"), to require an employer withdrawing from a multi-employer pension plan to pay a fixed debt to the pension plan resulted in a taking of the employer's property. Although recognizing that the assess-

ment of withdrawal liability "permanently deprived [plaintiff] of those assets necessary to satisfy its statutory obligation," 475 U.S. at 222, 106 S.Ct. at 1025, the Court rejected plaintiff's claim, relying on the three-part takings analysis of *Penn Central*. In the Court's view, the assessment was essentially a payment to satisfy the proportional liability that the employer had already incurred through its participation in the plan. The resultant liability might have been greater than the employer had anticipated; nevertheless, it was still proportional to its experience in the plan and in line with the employer's reasonable expectations. *Id.* at 226–27, 106 S.Ct. at 1027. In *Concrete Pipe* the Court reaffirmed its conclusion in *Connolly* that ERISA's withdrawal liability assessment was not a taking. Again, the Court relied heavily on the fact that plaintiff "could have had no reasonable expectation that it would not be faced with liability for promised benefits." —— U.S. at ——, 113 S.Ct. at 2291–92.

In both *Connolly* and *Concrete Pipe*, a direct relationship existed between the assessed liability and the withdrawing employer. The employer itself had received coverage of its employees directly from the multi-employer pension fund to which it had contributed. The withdrawal assessment was a reasonable projection of the benefit that the employer had received from the plan through

---

**10.** Even if the court were to apply the fairness test, the result would not change. The Federal Circuit recently noted that the proper inquiry under the fairness test is determining "[whether] the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all." *Florida Rock Indus. v. United States*, 18 F.3d 1560, 1571 (Fed.Cir.1994). Defendant asserted during oral argument that, in enacting the cross-guarantee assessment power, Congress determined that the burden of rectifying the problems of the nation's banking system were most justly borne by banks within the same bank system as failed banks. In all fairness and justice, it is BNEC, defendant argues, and not taxpayers, who should bear the burden for MNB's failure. Tr. at 58.

The application of the fairness test has always been predicated on a claimant's retaining some residual rights in his property. The resulting uncompensated takings were upheld because the mere diminution of the property owner's rights

was outweighed by the greater benefit to the public. *See Andrus v. Allard*, 444 U.S. at 65–66, 100 S.Ct. at 326–27 (prohibiting plaintiff from commercially selling endangered species was justified by the public interest in preserving the species since plaintiff still retained right to possess and transport species); *Penn Central*, 438 U.S. at 135, 98 S.Ct. at 2665 (city's interest in historic preservation outweighed property owner's interest in rebuilding rail station; regulation merely prohibited more profitable use of plaintiff's land, leaving present value unaffected); *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 490, 657 F.2d 1184, 1193 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982) (Government's limitation on land use necessary to achieve public purpose did not preclude other uses of land). BNEC's rights to its property (MNB) have not been merely diminished; they have been totally annihilated. Although no clear line exists for deciding when the public interest outweighs the private property interest, the Government's interest in paying for failed banks cannot justify the uncompensated appropriation that defendant advocates.

the plan's coverage of its employees, but for which the employer had not yet fully paid. In contrast, the benefit MNB received from the FDIC's coverage of BNE was remote, at best. No evidence appears that the cross-guarantee assessment was in any way related to MNB's interaction with the FDIC or was proportional to any debt that MNB had incurred through its participation in the Federal Deposit Insurance Fund. In this sense the claimants in *Connolly* and *Concrete Pipe* bear a much closer resemblance to those in *Golden Pacific* and *California Housing Securities.*

6. *Takings analysis for FIRREA assessments*

Determining plaintiff's reasonable investment-backed expectations at the time of the taking requires an analysis of the effect FIRREA had on banking law and thus a reasonable bank's real-world expectations.

Defendant explains that the cross-guarantee provision of FIRREA was prompted by the fear that bank holding companies were manipulating the multi-bank system by concentrating risky loans in a single bank. This practice isolated healthy banks within the system should the risky loans go bad. It also shifted the risk of failure to the FDIC, which insured the banks. The cross-guarantee statute carries with it an irrebuttable presumption that individual banks in a multi-bank system are manipulating the multi-bank structure and are thus responsible for the practices of all other banks within that system. The provision allows the corporate veil to be pierced automatically if one bank in the system fails. The corporate form that previously insulated individual banks from liability is disregarded, and all banks are treated as a single entity for liability purposes. The debts of one insolvent bank in a multi-bank system are attributed to every other bank in the system.

The court is conscious of concerns about the banking insurance system that prompted the enactment of FIRREA. The failure of the Federal Savings and Loan Insurance Corporation and the ominous predictions about the health of the Federal Deposit Insurance Fund call to light a serious problem that must be addressed. Nonetheless, Con-

gress may not remedy the problems now confronting the federal banking system by placing the financial burden on the backs of innocents.

■ The court must determine plaintiff's investment-backed interests at the time the taking occurred. If the individual banks within a multi-bank system ignored the corporate form and were operating as a single entity, they would not have a reasonable expectation that their corporate form would be respected regarding their liability for their parent and sister banks' debts. FIRREA's cross-guarantee statute did not change this perception. Thus, this case should proceed to trial for the limited purpose of determining whether the MNB and BNEC were operating in accordance with their separate corporate forms. If MNB did respect its corporate form, it could hold an historically-rooted expectation that it would not become liable for BNEC's debts. If the evidence warrants such a finding, the court must also conclude that MNB has suffered a taking.

## CONCLUSION

Based on the foregoing, the parties' cross-motions for summary judgment are denied. A scheduling order has been entered separately.

**IT IS SO ORDERED.**