The MERIDEN TRUST AND SAFE DEPOSIT COMPANY, Cenvest, Inc. of Meriden, Connecticut, and Shareholders of the Meriden Trust and Safe Deposit Company, Plaintiffs–Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Hoyle L. Robinson, and John W. Stone, Defendants–Appellees.

No. 1368, Docket 94–6219.

United States Court of Appeals, Second Circuit.

Argued April 17, 1995.

Decided Aug. 2, 1995.

Thomas J. Groark, Jr., Hartford, CT (Charles W. Fortune, Kathleen N. Dondero, Day, Berry & Howard, Hartford, CT, of counsel), for appellants.

Thomas L. Holzman, F.D.I.C., Washington, DC (Ann S. DuRoss and Thomas A. Schulz, Asst. Gen. Counsel, Colleen B. Bombardier and Robert G. Clark, Sr. Counsel, F.D.I.C., Washington, DC, of counsel), for appellees.

Before: MESKILL, ALTIMARI and CALABRESI, Circuit Judges.

MESKILL, Circuit Judge:

Meriden Trust and Safe Deposit Company (Meriden Trust), Cenvest, Inc. of Meriden, Connecticut (Cenvest), and the shareholders of Meriden Trust appeal a judgment of the United States District Court for the District of Connecticut, Covello, J., affirming the assessment by the Federal Deposit Insurance Corporation (FDIC) of the full amount of the losses resulting from the failure of a commonly owned bank. We conclude, in a case of first impression in this Circuit, that the assessment was proper under the Federal Deposit Insurance Act's cross-guarantee provision, 12 U.S.C. § 1815(e), and did not constitute an unconstitutional taking. Accordingly, we affirm.

## BACKGROUND

Cenvest, a bank holding company, acquired Central Bank, a bank and trust company chartered by Connecticut and insured by the FDIC, on September 22, 1987. Cenvest subsequently acquired Meriden Trust, another state-chartered bank insured by the FDIC, on November 22, 1988, and immediately transferred all of Meriden Trust's assets and liabilities, except for those related to its trust operations, to Central Bank. Meriden Trust ceased its day-to-day commercial banking operations after the transfer. Meriden Trust did not, however, dispense with its deposit-taking activities entirely. Meriden Trust accepted a $100,000 deposit in the name of Central Bank on February 13, 1989, the certificate for which later was renewed for a two year term to mature on February 13, 1992. Meriden Trust also held a $100,000 deposit in the name of Cenvest until May 1992.

Following the transfer, Meriden Trust's officers decided to maintain the bank's deposit insurance with the FDIC to protect its two deposits and to retain the abilities, if not the functions, of a full service bank. The decision also would save Meriden Trust the time and expense of reapplying for insurance from the FDIC if it later decided to renew its commercial banking operations. Meriden Trust continued to pay its deposit insurance premiums, and regularly filed the required "call reports," even after it informed the FDIC in January 1992 that it no longer deemed itself to be an "insured depository institution" under the Federal Deposit Insurance Act. Meriden Trust formally relinquished its insured status on July 16, 1992.

Central Bank experienced financial difficulties shortly after acquiring Meriden Trust's commercial banking activities, and on October 18, 1991 Connecticut's banking commissioner declared Central Bank insolvent and appointed the FDIC as its receiver. The FDIC then determined that Central Bank's expected liabilities exceeded its assets by approximately $152 million, and on October 16, 1992 the FDIC assessed this amount against Meriden Trust under the cross-guarantee provision of the Federal Deposit Insurance Act, 12 U.S.C. § 1815(e). This provision essentially holds liable any financial depository institution insured by the FDIC for any loss the FDIC incurs in connection with the default of a commonly controlled bank.

■ Meriden Trust filed this action in the district court shortly thereafter to challenge

the FDIC's Notice of Assessment, and the bank also sought administrative review pursuant to 12 U.S.C. § 1815(e)(3)(B). The parties then consented to a stay of the action in federal court pending the administrative appeal before the FDIC. An Administrative Law Judge for the FDIC then issued a recommended decision on May 10, 1993 affirming the assessment, which was adopted by the Board of Directors of the FDIC on September 21, 1993. With its administrative remedies exhausted Meriden Trust renewed its action in federal court, amending its complaint also to challenge the Board of Directors' decision. The parties filed cross-motions for summary judgment, and the district court (adopting the recommended ruling of a magistrate judge) ultimately granted summary judgment in the FDIC's favor on June 1, 1994. The assessment having rendered Meriden Trust insolvent, on July 6 the FDIC took possession of its business and property. Cenvest,[1] Meriden Trust and Meriden Trust's shareholders now appeal, arguing that Meriden Trust was not an "insured depository institution" subject to cross-guarantee liability under 12 U.S.C. § 1815(e), and that the application of this provision constituted a taking without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

## DISCUSSION

### I. *Applicability of the Cross–Guarantee Provision*

Appellants primarily challenge the judgment below on the ground that the FDIC improperly applied the cross-guarantee provision to Meriden Trust. This provision provides in pertinent part as follows:

> Any insured depository institution shall be liable for any loss incurred by the [FDIC], or any loss which the [FDIC] reasonably anticipates incurring, after August 9, 1989 in connection with—

**1.** Cenvest, as Meriden Trust's parent company and sole shareholder, moved the district court on August 29, 1994 for permission to intervene to appeal the court's decision. This step was necessary because the FDIC inherited all of Meriden

> (i) the default of a commonly controlled insured depository institution; or
>
> (ii) any assistance provided by the [FDIC] to any commonly controlled insured depository institution in danger of default.

12 U.S.C. § 1815(e)(1)(A). The Act defines a "commonly controlled insured depository institution" as any institution controlled by the same holding company or one such institution controlled by another, *see* 12 U.S.C. § 1815(e)(9), and appellants do not contest that Cenvest controlled both Meriden Trust and Central Bank during the relevant time period. Rather, appellants argue that Meriden Trust was not an "insured depository institution" within the meaning of the section, and thus was not subject to cross-guarantee liability.

While we review *de novo* the entry of summary judgment, *see Heilweil v. Mt. Sinai Hospital,* 32 F.3d 718, 721 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995), the district court here entered judgment by affirming an administrative assessment made by the Board of Directors of the FDIC. We thus review that decision under the Administrative Procedure Act's judicial review provisions, 5 U.S.C. § 701 *et seq. See* 12 U.S.C. § 1815(e)(3)(A) ("Actions of the [FDIC] shall be reviewable pursuant to chapter 7 of Title 5."). These provisions require us first to determine whether the statute at issue expresses clearly the intent of Congress. Where Congress has spoken directly to a question, "the court, as well as the agency, must give effect to th[at] unambiguously expressed intent." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 447–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.") (quotation omitted).

Trust's rights as its receiver, including the right to take an appeal of the court's decision. While the FDIC did not appeal the decision below, it consented to Cenvest's intervention for that purpose.

Where congressional intent is difficult to discern from the words of the statute, however, or where the statute does not address the issue directly, our review is limited to "whether the agency's answer is based on a permissible · construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Thus we will only reverse the FDIC's interpretation of the Federal Deposit Insurance Act if "it appears from the statute or its legislative history that the [FDIC's] interpretation is contrary to Congress's intent." *Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir. 1994) (quotation omitted).

█ The cross-guarantee provision applies to any "insured depository institution," which the Federal Deposit Insurance Act defines as "any [State] bank or savings association the deposits of which are insured by the [FDIC]." 12 U.S.C. § 1813(c)(2). Because Meriden Trust clearly was not a "savings association" we must look to the Act's definition of "State bank," which includes "any bank [or] trust company ... which ... (A) is engaged in the business of receiving deposits, other than trust funds." 12 U.S.C. § 1813(a)(2)(A). It is undisputed that Meriden Trust held two $100,000 deposits, and that it maintained its deposit insurance with the FDIC, prior to and following the collapse of Central Bank. Meriden Trust fit the Act's definition of a State bank, and thus was an "insured depository institution" during the period in question. Accordingly, it fell under the unambiguous terms of the cross-guarantee provision.

█ Appellants argue that Meriden Trust nonetheless did not constitute a "bank" under the above definition because it no longer received public deposits. In effect, appellants argue that a financial institution's status under the Federal Deposit Insurance Act must be determined by its activities, and thus Meriden Trust's status as an "insured depository institution" ceased in November 1988 after the transfer of its commercial banking operations to Central Bank. This argument assumes that the Act recognizes some form of financial institution that receives no public deposits but continues to be insured, thereby retaining the ability to receive deposits from the public at any time

without further FDIC approval. The Act, however, recognizes only two types of institutions: either one that is an "insured depository institution" or one that is "noninsured." *See* 12 U.S.C. §§ 1813(h); 1828(i)(3).

█ Appellants' position further depends on the premise that an insured financial institution, and not the FDIC, determines when that institution ceases its insured status. This ignores section 1818 of the Federal Deposit Insurance Act, which requires an insured institution seeking to terminate its insured status to send the FDIC a notice of intent at least 90 days prior to the expected termination date. *See* 12 U.S.C. § 1818(a). Further, section 1828(i)(3) of the Act states that "[w]ithout the prior written consent of the [FDIC], no insured depository institution shall convert into a noninsured bank or institution." Thus to terminate its deposit insurance Meriden Trust was required both to provide at least 90 days written notice to the FDIC and to receive the FDIC's consent. 12 U.S.C. §§ 1818(a), 1828(i)(3). Because Meriden Trust neither sent notice of voluntary termination to the FDIC nor received the FDIC's consent prior to the collapse of Central Bank, Meriden Trust remained on insured status as of that date.

In short, Meriden Trust sought both to maintain its insured status, thereby protecting its two deposits and its future ability to re-enter the commercial banking market, and to avoid any liability for a commonly owned bank. To interpret the cross-guarantee provision as Meriden Trust urges would allow institutions to change their status on their own volition, thereby permitting a bank (or its holding company) to transfer its liabilities to an affiliated bank and then (if things go sour) to avoid the cross-guarantee provision of responsibility for the loss. The FDIC could not hope to regulate a set of institutions which could change their status from "insured" to "noninsured" at will, and Congress sought to prevent precisely this result when it added that provision through section 206 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, § 206(a)(7) (1989). *See, e.g.*, H. Conf. Rep. No. 101–222, 101st Cong., 1st Sess. 395

(1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 432, 434 (1989) (noting that Congress intended to establish "liability to the FDIC for the loss or anticipated loss to the FDIC that arises from the default of a commonly controlled insured depository institution"). Meriden Trust did not rid itself of its deposits or attempt to lose its insured status until after the failure of Central Bank, when it was undeniably subject to cross-guarantee liability. Permitting Meriden Trust to avoid liability by allowing it to determine its own status would eviscerate the congressional purpose underlying the cross-guarantee provision. Accordingly, we find that the FDIC properly assessed against Meriden Trust the losses it incurred from the failure of Central Bank.

## II. *Whether Assessment Constituted a Taking*

Appellants also argue that the cross-guarantee assessment constituted a taking of private property for public use without just compensation, in violation of the Fifth Amendment. This argument is without merit.

■ Unconstitutional takings can occur in two ways. First, a property owner may suffer a physical invasion or permanent occupation of property. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Such a physical intrusion is compensable "without regard to the public interests that it may serve." *Loretto,* 458 U.S. at 426, 102 S.Ct. at 3171. Second, a regulatory scheme may result in a compensable taking without a physical invasion where the regulatory scheme goes "too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922); *see also Southview Assocs. v. Bongartz,* 980 F.2d 84, 93 n. 3 (2d Cir.1992) ("[A] regulatory taking—also known as inverse condemnation—occurs when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding."). In these circum-

stances the Court must take into account several factors, on a case-by-case basis, to determine "whether a governmental action has gone beyond 'regulation' and effects a 'taking.'" *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). Such factors include "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Id.* (quoting *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980)); *see also Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.

Appellants argue that the FDIC's cross-guarantee assessment against Meriden Trust constituted an unconstitutional regulatory taking because Cenvest, at the time it acquired Meriden Trust in 1988, had a reasonable investment-backed expectation that the FDIC would not hold Meriden Trust liable if Central Bank failed. Appellants argue that the passage of FIRREA in 1989, which added the cross-guarantee provision to the Federal Deposit Insurance Act, fundamentally altered Cenvest's property rights in Meriden Trust by adding the risk of Central Bank's failure.

■ Appellants of course are correct that the critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted. *See, e.g., Yancey v. United States,* 915 F.2d 1534, 1540 (Fed.Cir. 1990). Indeed, a paradigmatic regulatory taking occurs when a change in the law results in the immediate impairment of property rights, leaving the property owner no options to avoid the loss. *See, e.g., Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (holding regulatory taking occurred where passage of South Carolina Beachfront Management Act ended owner's plan of developing beach properties for single family residences); *cf. Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225–27, 106 S.Ct. 1018, 1026–27, 89 L.Ed.2d 166 (1986) (holding regulatory taking did not occur where retroactive application of law's withdrawal liability provisions advanced "a public program that adjusts the benefits and bur-

dens of economic life to promote the common good," did not cause a severe economic impact, and was not out of line with owner's investment-backed expectations).

██ The passage of FIRREA, however, did not subject Meriden Trust automatically to liability. Like all other financial institutions under common ownership, Meriden Trust then was faced with a choice: to continue as an "insured depository institution" and possibly become subject to cross-guarantee liability in the future, or to renounce its insured status. Meriden Trust chose to maintain its insured status after transferring its commercial banking activities to Central Bank, even in light of the new cross-guarantee provision added by FIRREA, thus voluntarily subjecting itself to a known obligation. Therefore, no unconstitutional taking occurred. *See Bowles v. Willingham,* 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944); *Garelick v. Sullivan,* 987 F.2d 913, 916 (2d Cir.) ("[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking."), *cert. denied,* —— U.S. ——, 114 S.Ct. 78, 126 L.Ed.2d 47 (1993); *cf. Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* —— U.S. ——, —— –——, 113 S.Ct. 2264, 2291–92, 124 L.Ed.2d 539 (1993) (emphasizing voluntariness of company's decision to participate in pension plan despite its lack of control over certain regulated aspects); *Golden Pacific Bancorp v. United States,* 15 F.3d 1066, 1073–74 (Fed. Cir.) (voluntary entry into highly regulated business deprives bank of any expectation that it would be compensated for actions of Comptroller of the Currency in declaring bank insolvent), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994).[2]

Even were we to find that Meriden Trust was compelled to maintain its insured status, however, we would conclude that no unconstitutional taking occurred under the case-specific analysis set forth by the Supreme Court in *Connolly.* Although Meriden Trust ultimately became insolvent as a result of Central Bank's debts, Meriden Trust and Central Bank presumably reaped benefits from joint ownership in the first instance. The mere fact that joint ownership here led to liability does not mean the "adverse economic impact" was caused by the cross-guarantee provision. *See Connolly,* 475 U.S. at 226, 106 S.Ct. at 1027 (holding an economic impact must be "a necessary consequence of the . . . regulatory scheme" to constitute a taking). Rather, Meriden Trust's losses were at least partly the result of Central Bank's failure, to whom Meriden Trust previously had transferred its liabilities. Second, the cross-guarantee provision did not significantly disrupt any reasonable investment-backed expectations, as "those who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* at 227, 106 S.Ct. at 1027 (quotation omitted). Finally, the character of the governmental action at issue here was in keeping with the economic reality of the relationship between Cenvest and its banks. The interference with Meriden Trust's property rights "ar[ose] from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Id.* at 225, 106 S.Ct. at 1025. Accordingly, appellants have failed to demonstrate "any deprivation significant enough to satisfy the *heavy burden* placed upon one alleging a regulatory taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472 (1987) (emphasis added).

---

**2.** Appellants argue strongly that we should follow a recent decision of the Court of Federal Claims, *Branch v. United States,* 31 Fed.Cl. 626 (1994), *petition for interlocutory appeal granted,* 42 F.3d 1409, 1994 WL 662593 (Fed.Cir.1994). The *Branch* Court held that an application of the cross-guarantee provision may constitute an unconstitutional taking. Notably, that court specifically rejected the argument that a party's voluntary continuance in a regulatory scheme precluded a takings claim, and thus its holding is ad-

verse to this Court's decision in *Garelick.* The *Branch* decision of course is not binding on this Court, and in any event it appears adverse to the Supreme Court's decision in *United States v. Sperry Corp.,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), which supports rejection of a *per se* takings analysis in a case involving deposit insurance under the Federal Deposit Insurance Act. *See id.* at 62 n. 9, 110 S.Ct. at 395 n. 9. We therefore decline appellants' invitation to follow *Branch.*

## CONCLUSION

For the reasons stated above, we find that the FDIC properly assessed cross-guarantee liability against Meriden Trust, and conclude that the assessment did not constitute an unconstitutional taking under the Fifth Amendment. The judgment of the district court accordingly is affirmed.